Filed 8/18/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)       S208398
      v. )
)       Ct.App. 6 H035423
DARIEL SHAZIER, )
)       Santa Clara County
      Defendant and Appellant. )       Super. Ct. No. 210813
_____ )

We granted the People's petition for review after the Court of Appeal overturned, for the second time, a jury's finding that defendant Dariel Shazier must be committed for secure confinement and treatment as a sexually violent predator (SVP) under the sexually violent predators act (SVPA; Welf. & Inst. Code, § 6600 et seq.). As the instant jury heard, defendant has served two separate prison terms for sex crimes, some forcible, against 13- to 17-year-old boys. Each time he was released on parole from the first sentence, with prohibitions against contact with minors, he soon violated those conditions and committed new offenses against members of the same target group. These acts resulted in several revocations of parole and, ultimately, in new convictions and imprisonment.

The instant jury also heard two expert witnesses opine defendant has a diagnosed mental disorder that impairs his volitional or emotional control and poses a danger to the health and safety of others by making it likely he will

commit new predatory violent sex offenses unless securely confined and treated. A defense expert disagreed, asserting that defendant's persistent sexual misconduct against postpubescent minors was merely criminal behavior and did not evidence a mental disorder as required for commitment under the SVPA.

There have been three trials on the petition to commit defendant as an SVP. The first trial resulted in a hung jury. A second jury found defendant met the criteria for commitment, but the Court of Appeal reversed because it found the prosecutor's violation of an in limine order to be prejudicial. We granted review and held the case for another matter then pending before us, but we ultimately dismissed review, thus reinstating the Court of Appeal's judgment. After a third jury trial, and a second SVP finding, the same Court of Appeal panel has again reversed, concluding that defendant suffered cumulative prejudice from multiple instances of prosecutorial misconduct.

We conclude the Court of Appeal erred in reversing the trial court judgment on these grounds. We identify one clear instance of misconduct, and one other instance of arguable misconduct. However, there is no reasonable probability these incidents, either singly or in combination, affected the outcome, nor did they render the trial fundamentally unfair. We will therefore reverse the judgment of the Court of Appeal.

Unfortunately, the Court of Appeal's ruling caused it to stop short of considering several additional claims raised by defendant. We will therefore remand the matter to that court for consideration of these additional issues.

**FACTS AND PROCEDURAL BACKGROUND**

*A. Events preceding defendant's third SVP trial.*

In October 1994, based on events occurring from August 1993 to April 1994, defendant pled guilty to sodomy and oral copulation of a drugged or intoxicated victim (Pen. Code, §§ 286, subd. (i), 288a, subd. (i)) against a 17-year-

2

old boy, forcible sodomy (*id.*, § 286, subd. (c)) upon a 14-year-old boy, and multiple counts of child molestation (*id.*, § 647.6) against boys ranging in age from 13 to 16. He was sentenced to a prison term of 17 years eight months.

In May 2003, while defendant was still incarcerated, the Santa Clara County District Attorney filed a petition to commit him as an SVP.[1] The original trial resulted in a hung jury. In March 2005, defendant was tried again. Prior to trial, the court ordered that there be no mention before the jury of the fact defendant would be sent to a state hospital (rather than prison) if the allegations were found true. However, during closing argument, the prosecutor told the jury it should not make its decision " 'based on what you think it's going to be like for [defendant] in Atascadero State Hospital.' " The second jury determined that defendant was an SVP, and he was committed for a two-year period. The Court of Appeal reversed, finding prejudicial misconduct in the prosecutor's remark. (*People v. Shazier* (May 8, 2006, H028674) (*Shazier I*).)

We granted review in *Shazier I* and held the case for *People v. Lopez* (2008) 42 Cal.4th 960, a criminal matter then pending before us that also concerned issues of prosecutorial misargument. After our decision in *Lopez* became final, we dismissed review in *Shazier I*, thus reinstating the Court of Appeal's judgment in the latter case.

---

[1] Though the record does not make it clear, it appears that, in light of the SVP petition, defendant was immediately placed in Atascadero State Hospital (ASH) at the commencement of his period of parole in 2004, and has remained confined at ASH, or more recently at Coalinga State Hospital (CSH), since that time.

3

### B. Evidence at third SVP trial.

At the third trial, in 2010, the People introduced documentary evidence that defendant had previously been convicted of a felony constituting a sexually violent offense (Welf. & Inst. Code, § 6600, subd. (a)(1)). The jury also heard facts about defendant's extensive history of sexual misconduct with postpubescent boys while he was free in the community prior to 1995.

Thus, in September 1987, defendant contacted two boys at a youth center and offered to show them karate. When one boy pulled a muscle, defendant got on top of him and massaged close to the boy's groin. Defendant was arrested for molestation, but the charges were dismissed.

In July 1988, defendant encountered several youths in a college dormitory. He enticed a 17-year-old boy into his car, saying he would show the minor some karate moves. Defendant supplied beer to the boy. They drove around and parked in an isolated area. Defendant straddled the boy, massaged his body and rubbed his penis. When the victim told defendant to stop, defendant offered him $60 to continue, and the victim declined. Defendant was charged with a lewd act, but the charge was dismissed.

In October 1988, defendant told a 16-year-old boy he was a movie star and offered the boy a part in a movie. After defendant lied to the boy's mother that he was her son's football coach, she gave permission for the two to go to dinner together. Instead, they went to a hot tub resort and then to defendant's room. There defendant had the boy undress and don nylon shorts. Defendant then digitally penetrated the boy's anus. Subsequent medical examination indicated anal lacerations. Soon thereafter, defendant was arrested in the clothing-optional section of the same facility, in the company of a 14- or 15-year-old boy, who was

4

clad in nylon shorts.  Defendant was giving this boy a massage.  In December 1988, defendant was convicted and sent to prison.[2]  He was paroled in late 1990, with requirements to avoid contact with minors and refrain from engaging in martial arts activity.

In April 1991, about three and one-half months after defendant's release on parole, evidence arose that he had established contact with about 15 minor boys whom he offered free karate classes.  He called these minors frequently on the telephone and kept names and telephone numbers in a notebook.  In interviews, two of the boys, aged 14 and 18, said defendant gave them massages that were " 'too close to their privates.' "  He told one boy he was a police officer and was involved in movies.  As a result of these contacts, defendant was found in violation of parole and returned to prison.

Defendant was paroled again in November 1991, with similar prohibitions against contact with minors and engaging in martial arts activities.  Five weeks later, he was arrested after he invited a 15-year-old boy to his house for karate lessons.  According to the minor, defendant offered to show him a "secret stretch" that should not be revealed to anyone else, then extensively massaged the victim's body.  Defendant tried to develop a relationship with the victim by offering to teach him to drive and inviting him to play basketball at night.  Defendant was again found in violation of parole and returned to prison.

In December 1992, defendant was released on parole once more, again with a condition against contact with minors.  In April 1993, he offered karate lessons to a 15-year-old boy in his church.  Later that year, his pastor confronted him about touching boys, and his association with the church ended.  He became

---

[2]     The 1988 conviction appears to have been for sexual battery.  (Pen. Code, § 243.4, subd. (a).)

5

involved with a number of boys to whom he was providing martial arts training. He called himself "Master Tang," and described himself as a Hindu master. He developed a " 'cult-like following' " and persuaded several boys to participate in purification rituals that required they continue to kiss him until "they [got] it right." He was again taken into custody. Even while confined, he attempted to maintain mail contact with the boys.

In March 1994, defendant persuaded two young brothers, one 14 years old, to help him move furniture at his apartment. To conceal his true identity, because he knew he was violating his parole, defendant identified himself to the 14-year-old as "Tim," and to the other brother as "Mike." During the incident, defendant took the 14-year-old into the bathroom, turned off the light, and sodomized him. When the boy told him to stop, defendant said " 'shut up' " and continued the assault. The victim's anal lacerations further indicated an element of force. The attack ended when the brother appeared in the bathroom. Defendant gave the victim money not to tell anyone what happened.

On April 4, 1994, defendant contacted a 17-year-old boy at a fast food restaurant, telling the boy he was a talent scout and the boy could make big money. Defendant brought the boy back to his house. He gave the boy a liquid drink and a glass of wine, which caused the boy to become intoxicated. After telling the boy to lie down, defendant rubbed the victim's legs and genitals and sodomized him. At some point during the incident, the victim passed out. Later, the two played basketball, then returned to defendant's home. He began to massage the victim's legs, removed the victim's clothes, and again sodomized him. The victim said he did not resist because he feared defendant's martial arts capabilities.

6

The events of April 1993 through April 1994 were the basis for defendant's October 1994 felony convictions. As indicated above, at the time of the instant trial, he had since been in continuous secure prison or hospital confinement.

Two experts from the panel of SVPA evaluators under contract with the Department of Mental Health (DMH) testified for the People.[3] Dr. Craig Updegrove, a licensed psychologist, diagnosed defendant with paraphilia "not otherwise specified" (paraphilia NOS), a lifelong disordered sexuality that can be controlled, but not cured. Defendant's particular form of the disorder, Dr. Updegrove suggested, is "hebephilia," which involves a sexual focus on underage boys who have attained puberty.[4] Dr. Updegrove also provided secondary diagnoses of personality disorder NOS and narcissistic traits.

Dr. Updegrove agreed that individuals who find postpubescent minors attractive, and even persons who have molested children, do not necessarily have mental disorders. However, he indicated that defendant's history reveals a singular, intense, and long-standing pattern of compulsive behavior, such that defendant has acted on his attraction again and again, by force if necessary, even after suffering severe and repeated penal sanctions for doing so, and even under supervised release on condition that he avoid all contact with minors.

---

[3] The name of this agency has recently been changed to the State Department of State Hospitals. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 647 (*Reilly*).) The prior name, DMH, was in use during the instant trial, and all parties have referred to the agency by that name. To avoid confusion, we do so here as well.

[4] Dr. Updegrove conceded that "hebephilia" is not currently a distinct diagnosis recognized in the Diagnostic and Statistical Manual (DSM) commonly employed by clinicians to diagnose mental disorders, but he explained that a movement is underway to add such a diagnosis. He testified it is accepted practice to diagnose persons whose disordered sexuality is focused on postpubescent teenagers with paraphilia NOS.

Dr. Updegrove also pointed to defendant's pattern of "grooming" his underage victims — manipulating them to gain their trust in order to exploit them sexually. Such persistent, compulsive, and manipulative behavior, Dr. Updegrove opined, demonstrates a disordered sexuality and an impairment of volitional control that predisposes defendant to reoffend against the target group.

With respect to defendant's risk of reoffense, Dr. Updegrove discussed defendant's scores on three commonly used actuarial risk assessment scales — the Static-99, and two more recent revisions, the Static-99R and the Static-2002R. Based on recidivism rates among sample groups of convicted sex offenders, these scales identify and assign numerical weights to established facts about a particular offender, such as his or her age and history of sexual convictions, as bases for predicting the likelihood he or she will commit new sex offenses. Dr. Updegrove suggested that these scales, which at most track criminal charges and convictions, actually underestimate the true rate of sex crime recidivism because many offenses are not reported, or do not result in criminal action.

As Dr. Updegrove also explained, defendant's raw numerical scores on each of these scales must be evaluated in connection with the particular data sample group to which he most appropriately belongs. Dr. Updegrove placed defendant in the "high risk" group of offenders — those who have independently been screened from the general pool of convicted sex criminals for special attention as likely reoffenders. For this high risk group, defendant's numerical scores on the three scales translated to a five-year risk of reoffense ranging from 10 to 23 percent, and a 10-year risk of reoffense ranging from 12 to 32 percent — ranges variously described as moderate, moderately high, and medium high.

Dr. Updegrove conceded that defendant has not reoffended, exhibited sexual preoccupations, or presented behavioral problems in custodial settings since 1994, and that he has been cooperative with institutional staff. But Dr. Updegrove

8

noted that defendant's historic lack of stable age-appropriate intimate relationships, his past poor performance on supervised release, the fact he has not been an "intrafamilial" molester, and his skill at "grooming" victims, all tend to increase the risk of reoffense, as well as the risk that any future sex offenses will be "predatory" — committed against strangers, or in relationships initiated for the purpose of sexual exploitation.

With respect to the need for secure confinement and treatment, Dr. Updegrove acknowledged defendant had voluntarily undergone therapy at CSH. However, Dr. Updegrove noted that at the time of trial, defendant had completed only two phases of the five-stage hospital treatment plan, and had not undergone the phases that directly prepare the patient for transition to the community. Moreover, in recent therapy, interviews, and psychological testing, defendant had exhibited some lack of candor and insight, and had attempted to present himself in a falsely positive light. In sum, Dr. Updegrove opined that defendant was reasonably likely to commit new predatory sex offenses unless securely confined. He asserted that defendant "has not had sufficient involvement in treatment or sufficient transparency, openness, really embracing a need for treatment that would allow him to be safely treated in the community."

Dr. Carolyn Murphy, a licensed clinical psychologist, expressed similar opinions on behalf of the People. Like Dr. Updegrove, she diagnosed defendant with paraphilia NOS, specifically "sex with nonconsenting persons or minors," with a secondary diagnosis of personality disorder NOS. She confirmed that the paraphilia NOS diagnosis currently covers sexual disorders focused on postpubescent minors, for which there is at present no separate category of disorder listed in the DSM. Like Dr. Updegrove, Dr. Murphy indicated that paraphilia is chronic and incurable, though methods of managing and controlling related behaviors can be learned.

9

As support for her conclusion that defendant's sexual orientation involves a mental disorder, not merely a departure from current societal norms, Dr. Murphy cited his extended history of sexual misconduct, sometimes perpetrated against the victims' will or when they were intoxicated or in pain; his patient and elaborate efforts to manipulate and "groom" potential victims, even to the extent of persuading them he was a Hindu master; and, in particular, the persistence of this pattern of behavior despite escalating penalties and sanctions. The extended pattern of misbehavior despite sanctions, Dr. Murphy indicated, also suggests an impairment of volitional and emotional control that predisposes him to commit sex offenses.

With respect to defendant's likelihood of committing new sex offenses, Dr. Murphy's testimony was also similar to that of Dr. Updegrove. Dr. Murphy assigned defendant a numerical score of five on the Static-99R, though at trial she said she would be more comfortable with a four. She concurred that defendant belonged in the "high risk" or "high need" data sample group for predictive purposes.[5] Accordingly, like Dr. Updegrove, she concluded that defendant's numerical score correlated to a 20.1 percent risk of reoffense within five years, and a 29.6 percent chance of reoffense within 10 years —a "moderate-high" risk. She also agreed that the Static scales underestimate the risk of reoffense, because

---

[5]     At this point, the prosecutor asked why Dr. Murphy had selected the high-risk data sample group, and she replied, "Because he's previously been committed to Coalinga State Hospital" — an apparent reference to the result of the previous commitment trial, which was reversed by the Court of Appeal in *Shazier I*. This reference violated an in limine order. Accordingly, defendant's counsel objected and moved to strike. The trial court granted the request, admonishing the jury to "disregard the last remark." Without objection, Dr. Murphy was then allowed to confirm, without further explanation, that she placed defendant in the high-risk, high-need data sample category.

they only measure the chance of reconviction, and "generally speaking we do a lot of things that we're not caught for, and even when we're caught, we're not necessarily formally arrested or charged or convicted."

Dr. Murphy said several "dynamic" factors that might otherwise mitigate the predictive value of the Static scales — factors such as advanced age, physical disability, impotence, or 10 years in the community without reoffense — were not present in defendant's case. She acknowledged defendant's good behavior in prison and hospital custody, but said that, given his frequent past reoffenses when free in the community, these latter factors "kind of balance each other out."

Dr. Murphy further opined that any new sex offenses by defendant were likely to be "predatory" — against strangers or in relationships forged for sexually exploitative purposes. She cited defendant's past pattern of frequenting places where teenagers are likely to be, his skill as a "groomer," and the absence of "significant psychological, emotional, or behavioral changes that override[ ] his . . . documentary evidence."

Finally, Dr. Murphy indicated that defendant still required a secure custodial environment to prevent future offenses. She acknowledged defendant's progress in treatment at CSH, and his willingness to undergo voluntary treatment in the community. She also noted defendant would apparently have some family support if released. However, like Dr. Updegrove, she observed that defendant had not yet undertaken the hospital treatment phase that stresses "active relapse prevention planning." She found insufficient progress to override the statistical evidence and defendant's "sheer pattern and frequency of offenses over time."

Testifying for defendant, Dr. Theodore Donaldson, a licensed psychologist, disputed these conclusions. His testimony stressed his view that defendant does not have a diagnosed mental disorder as necessary for commitment as an SVP. Dr. Donaldson asserted that, for purposes of the SVPA, the subject must have

11

some sort of paraphilic disorder that predisposes the person to sexual violence, and must also have serious difficulty in controlling his or her behavior. According to Dr. Donaldson, defendant has exhibited neither characteristic. While defendant may have a personality disorder, Dr. Donaldson indicated, this does not predispose him to sexual violence. Nor, Dr. Donaldson suggested, is there real evidence that defendant was specifically aroused by violence, or by his victims' nonconsent. Dr. Donaldson generally criticized the diagnosis of "paraphilia NOS nonconsent," saying it was an attempt, following the adoption of such laws as the SVPA, to "shoehorn" mere criminal rapists into a category of committable mental disorder.

Dr. Donaldson emphasized that, from a mental health standpoint, a sexual orientation, focus, or behavior is not "deviant," and thus a sign of mental illness, simply because it is illegal, immoral, or in violation of current societal norms. As Dr. Donaldson put it, "conflicts between the individual and society, including sexual ones, are not disorders unless [they are] due to [a] dysfunction within the individual." Thus, he suggested, "hebephilia" is not a valid diagnosis, because, absent a compulsion so strong that it impairs the person's general functioning, sexual behavior with postpubescent teenagers — the legality of which may vary from place to place — does not, in and of itself, evidence a mental disorder.

Dr. Donaldson insisted defendant exhibited no evidence of such internal conflict or dysfunction. Dr. Donaldson saw no sign of a compulsive attraction, and no indication that defendant "was disturbed by [his behavior], that it bothered him, which I think you have to have if you're going to try to shoehorn it under paraphilia NOS." According to Dr. Donaldson, in order to find the SVPA element of difficulty in controlling behavior — an impairment of volitional control — there must be indications that the person attempted such control. "I could not find any evidence," said Dr. Donaldson, "that [defendant] ever tried to control his

12

behavior or even that he wanted to . . . ."  "If they're just doing it because they want to," Dr. Donaldson declared, "that's just criminal behavior."

Addressing defendant's likelihood of reoffense, Dr. Donaldson indicated he would interpret defendant's scores on the actuarial scales employed by the prosecution as suggesting a "fairly low" risk.  In any event, Dr. Donaldson insisted he had "absolutely no confidence" in the predictive accuracy of these instruments.  Criticizing the methodology of such scales as the Static-99 and the Static-99R, Dr. Donaldson indicated they account for only 10 or 11 percent of the uncertainty in prediction, reducing this uncertainty from 100 percent to about 89 percent.  As a predictive tool, Dr. Donaldson declared, it is preferable simply to consult the "base rate" of sex offense recidivism in the United States, which, he stated, is "somewhere between four and six percent" over five years.

Dr. Donaldson declined to accept the prosecutor's suggestion that an offender who "will only admit to the precise number of victims for whom he has been caught . . . is almost certainly lying."  According to Dr. Donaldson, most unreported offenses are committed by a minority of offenders, making it inappropriate to assume that every offender has such crimes in his or her background.  However, Dr. Donaldson acknowledged that unreported offenses would be more likely if the perpetrator was a "master manipulator" who could persuade victims to keep quiet out of "misplaced loyalty . . . or fear."  Dr. Donaldson conceded that "we have such evidence" in this case.

Ultimately, Dr. Donaldson confirmed his view that, aside from any risk of reoffense defendant presented, he was not an SVP because he lacked a diagnosed mental disorder as required for that status.  Dr. Donaldson conceded that his views on this subject were at odds with the vast majority of evaluators on DMH's panel

13

of contract SVPA evaluators, and he admitted that in all SVP cases in which he had testified, he opined that the defendant was not an SVP.[6]

In his own testimony,[7] defendant admitted he was a child molester and was not contesting that he had the prior conviction or convictions necessary for SVP status. He denied having any victims other than those described in court and agreed he was "unlucky" for being caught every time he offended. Defendant conceded he was able to molest several of his underage victims because of his skill as a "master manipulator." He admitted he had once described himself as "addicted" to teenage boys, but he now denied this label, insisting he had learned through therapy to manage his attraction so he would not relapse. At trial, he

---

[6]     As indicated in greater detail below, issues of Dr. Donaldson's bias, and his divergence from mainstream opinion, arose on both direct and cross-examination. He testified that when the SVPA went into effect on January 1, 1996, he was on the original DMH panel of contract SVPA evaluators, but his contract was discontinued three months later. On direct examination, he attributed this to his vocal criticisms of DMH's protocol for predicting reoffense. He insisted he had "offered to teach a course to them because [he] didn't think they knew much about it," but received only a termination letter in reply. Thereafter, he recounted, he began to consult and testify exclusively for the defense in SVPA cases; if he believed he could not help a particular defendant's case, he simply did not testify at all. By the end of 2009, he had done 478 SVPA evaluations on 300 individuals in California, and had testified 289 times, always for the defense.

On cross-examination, Dr. Donaldson agreed he was "fired" from the DMH panel in 1996 because his theories were then "outside the mainstream," declaring that "[i]t's taken ten years for the science to catch up with where I was ten years ago" and "I was ahead of them on this stuff." In a major point of contention on appeal, the prosecutor also questioned Dr. Donaldson about the aggravated sex crime histories of the defendants in certain other SVP cases in which the witness had given defense testimony. For the most part, Dr. Donaldson professed inability to recall the details of those cases, prompting defense objections, overruled by the trial court, that the prosecutor had failed to lay a foundation for undermining the witness's diagnoses in those matters. (See pt. C.2 of Discussion.)

[7]     Defendant was called as a witness by both the prosecution and the defense.

14

claimed insight into his crimes and remorse for his victims, though he acknowledged he did not regret his acts when he was committing them, or even when, after being caught on prior occasions, he said he was sorry and had learned his lesson. He indicated that, although he had not progressed "that deep[ly] into therapy" at CSH, he was "learning about empathy."

There was no evidence defendant had reoffended while in prison and hospital confinement since 1994. He admitted that he had no access to underage males at CSH, but he pointed out that in prison there were 17-year-old inmates who had been tried and convicted as adults, and at CSH there were youths as young as 18. He indicated that, if released, he would live with his mother at her home in the Washington, D.C., area, and would rely on her and his sister, who also lived in that area, for support. He asserted that his Islamic faith, developed since 1994, would also help him not to molest underage victims.

Defendant denied having a mental disorder, but indicated he intended to seek and undergo voluntary treatment in the community. Asked how he would avoid underage teenage boys if released, defendant said he would use skills and strategies learned in therapy. Specifically, he indicated he had no reason to go to a park and would not go by himself to other places frequented by underage youths, such as a shopping mall. He insisted he was not likely to reoffend in a sexually violent manner, or in any other way.

Defendant presented several character witnesses. David Litmon, Joseph Johnson, and Fred Grant, all former SVPs who knew defendant at ASH and CSH, testified that he was respectful and positive, stood up for other patients, helped resolve conflicts, and was a representative in the government of the hospitals' living units. These witnesses indicated that, to their knowledge, defendant never engaged in illegal or inappropriate behavior, though many patients do.

15

Angelo Arrendondo and Phillip Morales were police officers at CSH. They testified that defendant was well-spoken and well-behaved, acted as a liaison between the patients and the officers, and would often help with difficult patients.

Michael Wayne Ross was employed as a psychiatric technician at ASH during "a number of years" that defendant was confined there. At one time, Ross testified, he was defendant's "sponsor," which meant he had to write monthly notes detailing whether defendant engaged in any forbidden sexual activity or deviant behavior, and whether he was complying with his treatment plan. Ross said he "never had an occasion to write a bad note about [defendant]."

Ross indicated there was a considerable amount of prohibited sexual behavior among ASH patients, including the circulation of internally produced child pornography materials, and role-playing activities suggesting, among other things, pedophilia. Also, Ross said, there were 19-year-old developmentally disabled or mentally ill patients who were susceptible to being preyed upon. However, the witness testified that, to his knowledge, defendant never participated in such improper activities. According to Ross, defendant was a "ward representative," an observant Muslim, and a de facto religious leader of the Islamic patient community. Ross noted that defendant's participation in voluntary treatment exposed him to adverse reactions from those patients who did not participate.

Defendant's sister, Crystal Bozeman, confirmed that she, like defendant's mother, lived in the Washington, D.C., area, and that defendant would live with his mother if released. Bozeman agreed the two women would be part of his support system in the community. Bozeman indicated she had been helping defendant find a therapist in the area, and would be willing to provide him with financial help if he needed it.

16

The jury found defendant to be an SVP, and judgment was entered accordingly.  Defendant appealed.

### C.  Court of Appeal opinion.

The Court of Appeal overturned the judgment.  In the appellate court's view, the prosecutor had committed misconduct when he (1) suggested, during argument, that the jurors would face obloquy and contempt in their communities unless they found defendant to be an SVP; (2) implied, during argument, that defendant had committed other crimes not in evidence; (3) noted, in his cross-examination of defendant, the proximity of schools to defendant's mother's home, and urged during argument that defendant would not be on parole if released — forbidden references, in the Court of Appeal's view, to the "consequences" of the jury's verdict; (4) questioned the defense expert, Dr. Donaldson, about the aggravated facts of other SVP cases in which the witness had given defense testimony; (5) cross-examined defense witness Michael Ross in an unduly argumentative manner; (6) told the jurors they were being "groomed" by defendant; and (7) referred in argument to defense witnesses Litmon, Johnson, and Grant as "serial rapists" and "a child molester."  The prosecutor had also engaged in "questionable" conduct, the Court of Appeal opined, by impugning both Dr. Donaldson and defense counsel.  Taken together, the Court of Appeal concluded, these incidents created an aggregate prejudicial effect, and infected the trial with such unfairness as to violate due process.

We granted the People's petition for review.  After careful examination of the record, we find only one clear instance of misconduct, and another that, as the People concede, may have been improper.  Whether considered singly or in combination, these incidents did not result in a fundamentally unfair trial, nor is there a reasonable probability they affected the outcome.  We will therefore reverse the Court of Appeal's judgment.

17

**DISCUSSION**

### A. The SVPA.

Under the SVPA, persons serving prison sentences may be referred for possible civil commitment at the conclusion of their terms on grounds that they are SVPs. (E.g., *Reilly*, *supra*, 57 Cal.4th 641, 646.) Welfare and Institutions Code section 6600, subdivision (a)(1),[8] defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." A " '[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

A commitment petition may be filed in the superior court only after a prisoner is first screened by the Department of Corrections and Rehabilitation, and then by two DMH-appointed independent evaluators who agree the individual is an SVP. (*Reilly*, *supra*, 57 Cal.4th 641, 647.) Once validly filed, the petition must thereafter be dismissed unless, after a hearing, the court finds " 'there is "probable cause" to believe that the person named in the petition is likely to engage in sexually violent predatory criminal behavior upon release. . . . However, if the court finds [such] probable cause . . . , the court orders a trial to determine whether the person is an SVP . . . .' " (*Id.*, at p. 648, quoting *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1146.)

---

[8] All further unlabeled statutory references are to the Welfare and Institutions Code.

18

In an SVP trial, the People must prove beyond reasonable doubt, among other things, that because of a diagnosed mental disorder affecting the person's volitional or emotional control, " 'it is likely he or she will engage in sexually violent behavior' if released." (*People v. Roberge* (2003) 29 Cal.4th 979, 982, italics omitted (*Roberge*); see *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922 (*Ghilotti*) [to permit filing of SVP commitment petition, independent evaluators must agree prisoner is " '*likely* to engage in acts of sexual violence without appropriate treatment and custody' "].) "Likely," in this context, does not mean more likely than not; instead, the standard of likelihood is met "when 'the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community.' " (*Roberge*, *supra*, at p. 982, quoting *Ghilotti*, *supra*, at p. 922.)

If the person is found to be an SVP, he or she must be committed "for an indeterminate term . . . for appropriate treatment and custody in a secure facility designated by the Director of State Hospitals [(Director)] . . . on the grounds of an institution under the jurisdiction of the Department of Corrections and Rehabilitation." (§ 6604.)[9] Thereafter, the person must be evaluated at least once a year to determine whether he or she still falls within the definition of an SVP, and whether, due to changes in the person's condition, a conditional or unconditional discharge would be in his or her best interest, and would adequately protect the community. If such an evaluation indicates that a conditional or unconditional discharge has become appropriate, the director must authorize the

---

[9] The former two-year commitment was changed to an indeterminate term by an initiative measure adopted by the electorate in November 2006. (Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006) § 27 ["Jessica's Law"].)

person to initiate, by petition, a court proceeding to obtain such a discharge. (§ 6604.1.)

### B. *Prosecutorial misconduct — legal principles.*

The Court of Appeal found, and defendant urges here, that multiple instances of prosecutorial misconduct, viewed in combination, prejudicially affected the outcome of the trial and rendered it fundamentally unfair. " 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 835 (*Jablonski*); see *People v. Hill* (1998) 17 Cal.4th 800, 819 [pattern of prosecutorial misconduct so egregious as to infect trial with fundamental unfairness and make conviction a denial of due process].) " 'Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citation.]" (*Jablonski*, *supra*, at p. 835.) Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Holt* (1984) 37 Cal.3d 436, 458.)

"As a prerequisite for advancing a claim of prosecutorial misconduct, the defendant is required to have objected to the alleged misconduct and requested an admonition 'unless an objection would have been futile or an admonition ineffective.' [Citation.]" (*Jablonski*, *supra*, 37 Cal.4th at p. 835.) " ' "To prevail on a claim of prosecutorial misconduct based on remarks to the jury," ' " there must appear " ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." [Citation.]

20

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide." ' [Citation.]" (*Ibid.*)

### C. Court of Appeal's prosecutorial misconduct findings.

#### 1. Questions and argument regarding "consequences" of verdict.

The Court of Appeal concluded that, by asking defendant about the location of parks and schools near his mother's home, and by reminding the jury in argument that defendant would not be on parole if released, the prosecutor improperly invited the jury to consider the "consequences" of its verdict. We disagree.

Both the prosecution and the defense devoted significant attention to defendant's postrelease plans, including his proposed living arrangements and his strategies for avoiding new offenses. Defendant testified that if released, he would live with his mother in a Maryland suburb of Washington, D.C., would avoid parks, and would not go alone to other places frequented by underage youths, such as shopping malls. During his direct examination of defendant, the prosecutor briefly asked about the proximity of his mother's house to "any schools or playgrounds." Defendant replied that he understood the home was "not very close" to such facilities. After the lunch break, the prosecutor asked again, "Now, you don't know how close the nearest school is to where your mother lives, correct?" Defendant responded that he did not know, though he was shown a map over the lunch hour "that can lay out a better perspective." Defense counsel did not object on either occasion.

Later, examining defendant as his own witness, defense counsel took up the same subject. Counsel asked whether defendant had seen a map of his mother's neighborhood, and defendant said he had. Counsel then inquired whether defendant "happen[ed] to notice that while it's not clear there are necessarily any

21

schools in the neighborhood that there are a few parks here and there and there are some shopping malls, things of that sort." Defendant responded, "I believe so." Counsel then asked how defendant would deal with the proximity of these locations. Defendant answered, as indicated above, that he would employ learned strategies and techniques to avoid going alone to places frequented by underage boys.

On cross-examination, the prosecutor pointed on a map to an elementary school he described as "very close to where you'll be living." Defendant declined to admit that the prosecutor had correctly characterized the proximity of the school, simply suggesting that the map gave the best perspective. The prosecutor then asked whether defendant could see "another school right over here," "a big park," "a McDonald's that looks . . . pretty close right around the corner," and "a big shopping mall right over here." Defendant variously responded, "I do," "Right," and "Yes." Defense counsel raised no objections. The prosecutor moved on to another topic.

During his closing argument, the prosecutor recapped defendant's history of sex crimes, noting that defendant reoffended each time he was not in secure confinement, even after he expressed remorse and claimed he would never do it again. This history, said the prosecutor, was the most relevant evidence of his risk of reoffending. Then the prosecutor declared, "And so there is really no stopping [defendant], not even when he was on parole. And now of course, you know, he is not on parole. So when [defendant] tells you that he is going to go live in Maryland with his mother, the only thing you have to . . . believe . . . is what [defendant] said. There is . . . no other guarantee wherever he is going to live outside of . . . a secured facility." Defense counsel raised no objection.

As noted, the Court of Appeal deemed these prosecutorial references to be improper allusions to the potential "consequences" of the jury's verdict. The

Court of Appeal reasoned that "[a] defendant's potential punishment or lack thereof is not a proper matter for juror consideration."

At the outset, it appears defendant forfeited, by his counsel's failure to object at trial, any argument that the prosecutor's questions about the neighborhood in which he would live if released were improper. The Court of Appeal stated that "defense counsel objected to all the prosecutor's improper questions, statements and arguments," but such is not the case. As the People note, defense counsel did not object either to the prosecutor's questions about the neighborhood where defendant would live, or to the prosecutor's argument that defendant would not be under any supervision if released.

Defendant insists such objections would have been futile, because, prior to trial, the trial court had unequivocally denied his in limine motion to exclude from the trial any mention of the fact that defendant would not be on parole. On this basis, we accept, for purposes of argument, that the "not on parole" issue was preserved for appeal. But defendant cites no similar pretrial ruling that permitted the prosecutor to ask defendant about parks and schools near where he would live. Hence, counsel's failure to object at trial to this line of inquiry forfeited any claim that it constituted misconduct.

In any event, neither claim of misconduct has merit. The jury was, of course, expressly instructed not to consider the "consequences" of its verdict. (CALCRIM No. 200; CALJIC No. 17.42.) But whatever the meaning and purpose of this instruction in the context of an SVP trial, it cannot be construed to prevent the prosecutor from exploring whether a mentally disordered sex offender's release into the community might lead to his or her commission of new violent predatory sex offenses. By the SVPA's terms, this is a critical and essential subject for the jury's consideration.

23

Thus, as the SVPA demands, the jury was charged with finding beyond reasonable doubt, among other things, whether "as a result of [a] diagnosed mental disorder [defendant] will be a danger to the health and safety of others because it is likely he will engage in sexually violent predatory criminal behavior" such that "it is necessary to keep him in custody in a secure facility to ensure the health and safety of others." (CALCRIM No. 3454; see §§ 6600, subd. (a)(1), 6601, subd. (d); *Roberge*, *supra*, 29 Cal.4th 979, 982.) The prosecutor's obvious effort was to persuade the jury that, because of the nature of defendant's diagnosed mental disorder, the conditions under which he would live if not securely confined as an SVP would contribute to the degree of likelihood that he would reoffend. The Court of Appeal's facile assertion that the prosecutor wrongly invited the jury to consider the consequences of its verdict thus cannot be sustained.

Perhaps aware that this is so, defendant here urges narrower grounds in support of the Court of Appeal's decision. He asserts that an SVP defendant's specific release plans, and the particular circumstances and conditions under which he or she would live in the community, generally are irrelevant factors for the jury's consideration. Instead, he argues, the SVPA requires the jury to focus exclusively on whether the person's diagnosed mental disorder is such that it can only be managed in secure confinement — in other words, whether the disorder itself is so severe in nature and degree as to render the person unsafe anywhere, and under any circumstances, except in secure custody. Thus, defendant urges, the only issues pertinent to his safe release were whether he was willing to undergo voluntary treatment in the community for his disorder, if any, and whether the disorder was of a kind and degree that was amenable to voluntary community treatment.

Accordingly, defendant reasons, evidence or argument that he would be unsupervised if released, and that he might be living near parks and schools where

24

underage youths congregate, was irrelevant. Defendant insinuates that even if, as a practical matter, these factors affected his opportunity to reoffend, they were beyond the proper scope of the jury's consideration, because they had nothing directly to do with why the nature and degree of his diagnosed mental disorder might require his secure confinement to avert the danger of reoffense.

On the contrary, the topics raised by the prosecutor were directly pertinent to whether defendant's particular mental disorder made it likely he would commit new offenses unless confined. The essence of the prosecution's case, discussed at length by its mental health experts, was that defendant was not merely attracted to postpubescent underage males, but had an urgent, mentally disordered compulsion to engage in sexual activity with them. This incurable disorder, the prosecution experts opined, was demonstrated by defendant's past persistence in offending whenever free of secure confinement, even after being incarcerated, and even in violation of several supervised paroles, by going to places, and engaging in activities, that allowed him to contact, manipulate, and groom members of the target group for sexual purposes.

These witnesses acknowledged that defendant would apparently have a home and family support if released, and they conceded his asserted willingness to undergo voluntary treatment in the community, but they both believed he nonetheless still required secure confinement to prevent a likelihood of reoffense. In making its case to the ultimate fact finder, the prosecution was entitled to support these conclusions with evidence that unless so confined, defendant would lack even the parole supervision which had previously failed to deter him, and would live in conditions affording an opportunity to recommence his prior pattern of misconduct. In short, such evidence related directly to whether his particular

25

diagnosed mental disorder, as demonstrated by his past conduct, made it likely he would reoffend if not confined.[10]

Our decision in *Ghilotti*, *supra*, 27 Cal.4th 888, does not suggest otherwise. There we held, among other things, that when independent evaluators determine whether an SVP commitment petition may be filed on grounds the person has a diagnosable mental disorder making it likely he or she will engage in acts of sexual violence "without appropriate treatment and custody" (§ 6601, subd. (d)), they must assess whether *both* treatment *and* custody are necessary, or whether the disorder "is of a kind and extent that can be effectively treated in the community, and whether the disorder leaves the person willing and able to pursue such treatment voluntarily." (*Ghilotti*, *supra*, at p. 927.) At every other stage of an SVP proceeding as well, it must be considered whether an offender's diagnosed mental disorder, even if dangerous when untreated, requires secure confinement, or whether community treatment the person is willing to undergo would suffice to eliminate a substantial risk he or she will reoffend. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 256 [probable cause hearing]; *Roberge*, *supra*, 29 Cal.4th 979, 988, fn. 2 [trial]; see also *People v. Grassini* (2003) 113 Cal.App.4th 765, 777.)

Defendant suggests that *Ghilotti* limited this inquiry, and thus the issues pertinent to an offender's release even with a dangerous sexual disorder, to the nature and characteristics of the disorder itself. Hence, he urges, external factors

---

**10** The trial court employed similar reasoning in denying defendant's motion to preclude the prosecutor from mentioning that defendant would not be on parole if released. Specifically, the court explained that information about the absence of parole restrictions "is relevant, particularly if the defense is that Mr. Shazier seeks to take advantage of treatment in the community. It is important for the jury to have a picture that there will be no restrictions, no controls, and no conditions for his release."

26

that might affect whether the disorder presents a community danger even with voluntary treatment may not be considered.

But *Ghilotti* did not impose such restrictions on the duty to determine whether a sex offender with a dangerous mental disorder can be safely released. Indeed, *Ghilotti* made clear that, in assessing the viability of release with voluntary community treatment, expert evaluators at the initial screening stage of an SVP proceeding "may consider any factor which, in their professional judgment, is relevant to the *ultimate issue* whether the person is a substantial danger to reoffend if free in the community *without any conditions, supervision, monitoring, or mandatory treatment* in the Director's custody." (*Ghilotti*, *supra*, 27 Cal.4th 888, 927, italics added.)

The fact finder in an SVP trial must have similar latitude to resolve the "ultimate issue" identified in *Ghilotti*. That the offender, if released, *will* be "without any conditions, supervision, monitoring, or mandatory treatment" is obviously relevant to this determination — especially where, as here, the prosecution has sought to show the disorder is of a kind and extent that has produced repeated offenses even under supervised release. Evidence that the circumstances of the person's release may afford a particular opportunity to re-engage in the pattern of conduct that marks the disorder, as described by expert witnesses, is similarly pertinent to whether the disorder is likely to cause the person to reoffend in the future without secure confinement.

We are not persuaded otherwise by *People v. Krah* (2003) 114 Cal.App.4th 534 (*Krah*). There an SVP defendant urged the trial court had erred by excluding his proffered evidence that, if released, he would be subject to parole conditions designed to prevent him from committing new sex offenses. The Court of Appeal disagreed. It reasoned that the sole focus of an SVP proceeding is whether the defendant has a diagnosed mental disorder that predisposes him or her to commit

new violent sex offenses. Temporary mandatory parole conditions, said the Court of Appeal, have nothing to do with whether the defendant harbors such a mental condition. Introduction of evidence about the presence or absence of parole condititions, the Court of Appeal asserted, might confuse the jurors by implying they should base their determination on the effectiveness of the policing function, rather than on the defendant's dangerous mentally disordered predisposition. Such is not the case, the Court of Appeal explained; while the SVPA makes a defendant's amenability to effective *voluntary* treatment in the community relevant to whether he may be safely released, the premise that he would be *required* to comply with terms and conditions of parole is not similarly pertinent. In sum, said the Court of Appeal, such evidence "does not relate to the nature of the defendant's disorder or reflect in any way his willingness or ability to pursue treatment voluntarily." (*Krah*, *supra*, at p. 546.)

Thus, in *Krah*, the appellate court rejected an SVP defendant's attempt to show that, even if the nature and extent of his sexually dangerous mental disorder made him likely to reoffend if free in the community without supervision or conditions, he nonetheless need not be confined because parole monitoring would hold him safely in check. In other words, the defendant sought, by proffering evidence of parole, to persuade his jury he should be released for reasons extraneous to his status as an SVP.

Here, by contrast, the prosecution simply sought to convey the logical inference that if the nature and extent of defendant's diagnosed mental disorder compelled him to commit multiple sex offenses of a particular kind even when supervised on parole, under conditions specifically intended to forestall such misconduct, a fortiori, that disorder made it likely he would reoffend if free in the community "without any conditions, supervision, monitoring, or mandatory treatment." (*Ghilotti*, *supra*, 27 Cal.4th 888, 927.) We find in this approach no

28

improper effort to persuade the jury that defendant should be kept in secure confinement for reasons extraneous to his status as an SVP.

Accordingly, the prosecutor's allusions to the absence of parole monitoring, and to opportunities for similar reoffense in the neighborhood where defendant proposed to live if released, were not misconduct. Both topics were pertinent to the "ultimate issue" whether, as a result of defendant's diagnosed mental disorder, he was likely to commit new violent sex offenses if released unsupervised into the community.

### 2. "Other case" questions to defense expert.

The Court of Appeal determined that the prosecutor committed misconduct by questioning the defense expert, Dr. Donaldson, about the facts of other cases in which the witness had testified the defendants were not SVPs. The appellate court reasoned that because Dr. Donaldson did not have his files with him in court, so he could refresh his recollection about the details of his diagnoses in those cases, this line of inquiry was irrelevant, and was thus calculated simply to inflame the jurors by placing before them the incendiary facts of other SVP matters. Unlike the Court of Appeal, we are not persuaded the prosecutor's questions were improper.

As noted above, both the defense and the prosecution devoted significant attention to whether Dr. Donaldson was a credible, unbiased witness. On direct examination, Dr. Donaldson testified that DMH had terminated him from its panel of contract SVP evaluators after only a few months because of disagreements about evaluation methodology, that he thereafter began consulting exclusively for the defense side in SVP cases, and that he had since testified in 289 such cases in California, always for the defense. On cross-examination, Dr. Donaldson confirmed that he had been terminated from the contract panel because he was then "outside the mainstream" of professional opinion, and that he had since testified "hundreds of times," solely on the defense side.

29

The prosecutor indicated his intent to question Dr. Donaldson about "five or six" of these other cases. Defense counsel immediately asked to approach the bench. After an unreported sidebar discussion, the prosecutor asked Dr. Donaldson if he remembered the case of Ronald Ward. The court overruled defense counsel's relevance objection. Dr. Donaldson said he remembered the name, but not the case. The prosecutor began to ask an "[i]f I told you" question. Defense counsel interrupted to object, urging that the prosecutor could not "get into diagnosis" in other cases without having "all the information . . . that Dr. Donaldson and the other evaluators relied on," and "without knowing anything more about those cases than just an inflammatory recital." The court overruled the objection "at this point," stating its belief that the prosecutor was "trying to refresh [the witness's] recollection."

The prosecutor then asked whether Dr. Donaldson recalled that, after serving a prison sentence for raping a hitchhiker, Ward tried to rape an 11-year-old girl in her home while her mother was absent, and then, after serving another sentence for that crime, met and married a woman upon whose two children he promptly committed five counts of molestation. Defense counsel again objected to this line of questioning as inflammatory, urging that "we don't know anything about this case. We don't have any records, any psychological records." The court overruled the objection.

Amid continuing, unsuccessful defense objections that the information was insufficient to refresh the witness's recollection, Dr. Donaldson agreed he had testified, in a Riverside County case, that Ward was not an SVP. Dr. Donaldson asserted he had "determined [Ward] did not meet one of the criteria [for SVP status], but I don't know which one it was, whether it was a mental disorder or predisposition."

After a lunch break, the prosecution engaged in a similar series of questions about Dr. Donaldson's evaluation, during the late 1990s or early 2000s, of one Badura. The witness said he remembered the name, whereupon the prosecutor asked whether he would remember more "if I told you that [Badura] was accused of molesting every child in his apartment complex, including his own three-and-a-half year old son." Defense counsel interposed another "continuing" objection, which was overruled. Dr. Donaldson indicated he did not remember the specifics of the case.

The prosecutor asked if Dr. Donaldson recalled one Richard Flick, "an older gentleman who used one child to hold down another child in order to molest her." Dr. Donaldson said he did not recall the case. Asked about one Marcus Rawls, Dr. Donaldson said he remembered the name, but nothing else. The prosecutor inquired whether the witness would recall the Rawls case "[i]f I told you that [it] involved a forcible rape where several weapons were used, including a baseball bat that he shoved up a victim's rectum, that he used guns, that he pistol-whipped a victim, there were several victims, several convictions." The witness indicated he still did not recall.

Finally, the prosecutor inquired about Dr. Donaldson's recollection of "the case of Mr. Hubbart here in Santa Clara County." The prosecutor indicated this "was a very big case" that "went up to the California Supreme Court at one time."[11] Dr. Donaldson agreed he was a defense witness in the case, but insisted he remembered nothing about the facts, though the prosecutor again stressed it was a "high-profile case" that "made case law."

---

[11] *Hubbart v. Superior Court*, *supra*, 19 Cal.4th 1138.

31

The prosecutor asked whether it would refresh the witness's recollection "if I told you some stand-out factors about the Hubbart case." Dr. Donaldson responded, "It might." The prosecutor then gave the following account: "[Hubbart] admitted to more than 50 burglaries with the intent to commit rape where he would rape a lone female after gagging and binding her, and in some cases he gave her an enema and he threatened to kill her if she didn't cooperate. He was deemed an MDSO, mentally disordered sex offender [as defined in a repealed statutory predecessor to the SVPA], after being caught as a serial rapist in [Los Angeles]. He did seven years in Atascadero State Hospital as an MDSO, and then he was released from the hospital." Dr. Donaldson indicated he still recalled no factual specifics about the case.

Pressing home his point, the prosecutor asked Dr. Donaldson whether it was "fair [to say] it wouldn't have mattered in any of these cases for your opinion, or in any SVP case, how absolutely repulsive the conduct is because that's just describing their criminality. It really just doesn't show that they have any sort of mental disorder." The witness replied it was "true that criminal behavior does not identify a mental disorder." "So," the prosecutor asserted, "the point is, it's not just a so-called yuck factor . . . . In fact, in every case since you've testified in court you have determined that the person did not qualify to be a sexually violent predator, correct?" The witness agreed.

Later, on redirect examination of Dr. Updegrove, the prosecutor asked whether the witness believed "that a person's criminal conduct can be circumstantial evidence that the person has a mental disorder that predisposes that person to certain types of criminal conduct." Dr. Updegrove replied, "Absolutely."

The prosecutor then described to Dr. Updegrove, in hypothetical form, the facts of the Ward case as he had previously outlined them to Dr. Donaldson. The

32

prosecutor asked Dr. Updegrove whether, given this hypothetical, it would be "unreasonable to find the absence of a mental disorder under those bare-bone facts." The court overruled a defense objection that the hypothetical was improper. The prosecutor re-asked the question, and the witness responded, "I believe so," adding that it would "certainly" be "unreasonable not to consider the possibility of the mental disorder." Dr. Updegrove agreed it was not the "yuck factor" that led him to this opinion, explaining that the relevance lay in the pattern of quick reoffense despite sanctions. When the prosecutor suggested the point was "[a] pattern of difficulty in controlling one's behavior," the witness replied, "Yes."

On recross-examination, Dr. Updegrove clarified that, before drawing any conclusions about the "bare-bones" hypothetical facts described by the prosecutor, he "would want to know more and would not automatically make a diagnosis on that fact pattern by itself." However, Dr. Updegrove asserted, "there would be a likelihood of making a diagnosis."

The record discloses no misconduct in the prosecutor's questioning of Dr. Donaldson. " '[T]he scope of cross-examination of an expert witness is especially broad . . . .' [Citations.] 'A party "may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution [is] entitled to attempt to discredit the expert's opinion. [Citation.] In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence. [Citation.]" [Citation.]' [Citation.] The prosecutor may properly cross-examine a witness to show bias . . . that would bear on the question of the credibility of the witness. [Citations.] An expert's testimony in prior cases involving similar issues is a legitimate subject of cross-examination when it is relevant to the bias of the witness. [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 123; accord,

33

*People v. Zambrano* (2007) 41 Cal.4th 1082, 1165 (*Zambrano*); *People v. Price* (1991) 1 Cal.4th 324, 457 (*Price*).)

Thus, in *Price*, the defense in a capital multiple-murder trial sought to cast suspicion for one of the murders on the female victim's male housemate. In this regard, a defense psychiatrist testified about the so-called domestic homicide syndrome, implying that certain forensic details about the victim's body were consistent with such a scenario. We held it was permissible for the prosecutor to explore the witness's possible bias by asking the witness whether he had testified for the defense in the Dan White case — a case the witness had discussed in his book on the domestic homicide syndrome — and to comment in argument on the witness's involvement in that matter. (*Price*, *supra*, 1 Cal.4th at p. 457.)

Similarly, in *Zambrano*, a former Director of the Department of Corrections, testifying for the defense as a prison expert, opined at the penalty phase of a capital murder trial that the defendant would present no undue safety risk behind bars if his life was spared. We held the prosecutor was entitled to examine the witness about his frequent trial appearances for defendants on prison-adjustment issues, and to elicit the witness's admission that he had recently testified a defendant with four separate murders and six attempted murders would adapt safely to prison life. We said that "[d]espite arguable differences in the facts of the two cases, they involved 'similar issues' of the expert's views on prison adjustment. The prosecutor was entitled to expose bias in the witness by showing his propensity to advocate for criminal defendants even in extreme cases." (*Zambrano*, *supra*, 41 Cal.4th at p. 1165.)

The gravamen of the instant Court of Appeal's finding of misconduct, as echoed by defendant before us, is that the prosecutor acted in bad faith, because he persisted in questioning Dr. Donaldson about cases the witness was not prepared to discuss, and without laying a proper foundation for an attack on the witness's

diagnoses in those matters, for the sole purpose of using their unsavory facts to inflame the jury. We are not persuaded.

As our prior decisions suggest, the prosecutor was entitled to explore Dr. Donaldson's bias, and the validity of his professional approach, by inquiring about the witness's conclusions in other SVP matters where he had testified for the defense. In order to commence such a line of inquiry, and to give Dr. Donaldson the chance to defend his conclusions if he could, the prosecutor was obliged, and entitled, to attempt to refresh the witness's recollection of these other cases by providing a brief recitation of their salient facts.

For its contrary conclusion, the Court of Appeal relied heavily on *People v. Buffington* (2007) 152 Cal.App.4th 446 (*Buffington*), a divided decision in another case where Dr. Donaldson testified for the defense. Defendant Buffington was sent to prison after a spree of violent rapes against females from 14 to 69 years old. In prison, and later in ASH, there were several incidents of masturbation and hostile acts involving female staff. At Buffington's SVP trial, based on his history and Static-99 score, two psychologists testifying for the prosecution diagnosed him with paraphilia NOS, antisocial personality disorder, bipolar disorder, and substance abuse. They rated his risk of offense at medium-high to high.

Dr. Donaldson denied that Buffington had a diagnosed mental disorder or was likely to reoffend. He disagreed that Buffington harbored paraphilia, suggesting such a diagnosis was " '[v]ery, very controversial' for 'rape behaviors.' " (*Buffington*, *supra*, 152 Cal.App.4th 446, 452.) Dr. Donaldson also asserted that Buffington had been able to control his sexually dangerous behavior at ASH because, though he had " 'act[ed] out,' " he had not sexually assaulted anyone. (*Ibid.*)

For purposes of impeachment, the *Buffington* prosecutor elicited, without objection, Dr. Donaldson's acknowledgement that he was a well-paid expert

witness who routinely gave defense testimony and rarely agreed with the state's experts about which offenders met the SVP criteria. Over objection, the prosecutor also questioned Dr. Donaldson about the facts of three such cases, in each of which, despite the offender's aggravated history of sex crimes, the witness had maintained the offender either had no diagnosed mental disorder or was able to control his sexually dangerous behavior. On redirect examination, Dr. Donaldson insisted, as in the instant case, that "no amount of criminal activity creates a mental disorder," and that "[c]onflicts between the individual and society, including sexual ones, are not disorders unless they are due to [a] dysfunction [within the individual]." (*Buffington*, *supra*, 152 Cal.App.4th at p. 454.)

Though it found no prejudice, the *Buffington* majority held that the trial court erred in permitting the prosecutor's questions because, on the record at issue in that case, evidence regarding Dr. Donaldson's opinions in the other matters was irrelevant. The majority rejected the People's argument that the "other cases" inquiry was relevant to show Dr. Donaldson's bias and prejudice. Critical, in the majority's view, was the absence of prosecution expert testimony that, under the described facts of the other cases, standing alone, it would have been unreasonable *not* to have found diagnosed mental disorders. Had the prosecution presented such expert opinion, the *Buffington* majority indicated, it might have been permissible to elicit evidence of Dr. Donaldson's contrary opinions, and thus to undermine the validity of his conclusions in all the cases, including Buffington's. However, the majority reasoned, absent such expert testimony, the jury had to apply its lay instinct to weigh the value of Dr. Donaldson's diagnostic assessments in the other cases, presumably by inferring that anyone who committed such aggravated sex offenses must be mentally disordered. Such "common sense" reasoning is impermissible, the majority concluded, to determine the existence of a diagnosed

36

mental disorder for purposes of the SVPA. (*Buffington*, *supra*, 152 Cal.App.4th at p. 456.)[12]

Whatever the merits of the majority's analysis in *Buffington*, it does not compel the Court of Appeal's conclusions in this case. The narrow point decided by the Court of Appeal, and argued before us, is not that the prosecutor's cross-examination was objectionable because it was irrelevant, lacked foundation, or created a risk of undue prejudice, but that it was misconduct, because it was undertaken in bad faith, without any proper purpose, solely in hopes of creating such prejudice. This record does not support such a finding. For all that appears, the prosecutor acted in an honest, if not entirely successful, effort to attack the validity of Dr. Donaldson's opinions in the other cases, and in doing so, to fill the foundational gap identified by the *Buffington* majority.

Thus, after questioning Dr. Donaldson in an effort to refresh the witness's recollection about the other cases in which he had testified, the prosecutor recalled his own expert, Dr. Updegrove, to the stand. The prosecutor then posed to Dr. Updegrove the very question *Buffington* suggested is necessary to lay the proper

---

[12]    The concurring opinion in *Buffington* urged three reasons why the prosecutor's "other crimes" inquiry in that case was relevant and proper: First, the prosecution had presented expert testimony discrediting Dr. Donaldson's consistent theory that repetitive sexual criminality alone cannot establish a sexually dangerous mental disorder. Thus, the jury had an expert foundation to conclude that, because Dr. Donaldson's theory in those cases was the same as his theory in Buffington's, his opinion about Buffington was similarly biased and meritless. Second, a jury may use circumstantial evidence, combined with expert opinion, to decide if a person has such a disorder. A conclusion that normal people do not commit repetitive violent sex crimes is not so beyond lay understanding as to preclude the jury's consideration of such evidence for this purpose. Third, the facts of the three prior cases were relevant to place Dr. Donaldson's opinions into perspective, and to help the jurors decide whether those opinions were illogical, unprincipled, or motivated by profit. (*Buffington*, *supra*, 152 Cal.App.4th 446, 461 (conc. opn. of Scotland, P.J.).)

37

foundation. After providing a hypothetical based on the facts of the Ward case —
the only one about which Dr. Donaldson had indicated any significant recall — the
prosecutor asked Dr. Updegrove whether it would be "unreasonable to find the
absence of a mental disorder under those bare-bones facts." Dr. Updegrove
initially indicated he believed it would, then added that it would "certainly" be
"unreasonable not to consider the possibility of the mental disorder."

In preparation for demonstrating, through the prosecution's own expert,
that Dr. Donaldson's expert opinions in prior cases cast doubt on his conclusions
here, it was not improper to describe to Dr. Donaldson the facts the prosecutor
deemed pertinent in those cases in order to refresh the witness's recollection and,
if possible, to allow him to explain his reasoning in those matters. As it turned
out, the testimony of the prosecution expert on the *Buffington* foundational issue
— necessarily limited to the only case Dr. Donaldson even remembered — may
have been somewhat less helpful than the prosecutor hoped or expected, but that
does not render his cross-examination an example of bad faith misconduct. There
is no reason to assume his examination of Dr. Donaldson was wrongly motivated,
and his effort to establish the foundation required by *Buffington* is strong evidence
to the contrary. The *Buffington* decision was not based on a claim of prosecutorial
misconduct, and it therefore does not dispose of the issue before us here.

We therefore conclude that the Court of Appeal's finding of prosecutorial
misconduct was erroneous. Whether the prosecutor's line of inquiry was directly
objectionable for other reasons (including, as he argued in the Court of Appeal,
under Evidence Code section 352), and whether *Buffington* was correctly decided,
are questions that are not before us.

### 3. Examination of defense witness Ross.

As indicated above, Michael Ross, a psychiatric technician formerly
employed at ASH, testified in defendant's behalf that, while confined there,

defendant was well-behaved and a leader in the patient community. The Court of Appeal concluded that certain aspects of the prosecutor's cross-examination of Ross were unduly argumentative. We disagree.

Early in the cross-examination, the prosecutor elicited Ross's recollection that defendant had been at CSH for the prior three years, and at ASH for "at least" six years before that. "So," the prosecutor asked, "you believe he's been in the state hospital system since 2001 at least?" Ross agreed that was his understanding. He also indicated he could not recall defendant's offenses, though they were probably "child pedophilia or something." "I work with too many of these guys," Ross said, "to remember these things." When the prosecutor asked Ross to concede he was "here to help Mr. Shazier," Ross insisted he was just on the stand to tell the truth and was not "emotionally attached" to defendant.

At this point, the prosecutor interjected, "Mr. Ross, you don't know what you're talking about, do you?" The court overruled defense counsel's objection that the question was vague, overbroad, and argumentative. Ross retorted in essence that even if the prosecutor could make him "look stupid" for failing to recall exact dates and times, he knew he had observed defendant for a lengthy period and found him to be a good patient.

For the moment, the prosecutor moved on to other subjects, in particular the witness's degree of knowledge and expertise in sexual disorders, including pedophilia, and the reasons why he was no longer employed at ASH. A bit later, however, the prosecutor again began to question Ross about his chronological recollection of defendant's case. The prosecutor asked whether Ross knew defendant had actually been in Mule Creek State Prison (rather than ASH) in March of 2003. Ross said he might have known this at some earlier time, but did not currently so recall. The prosecutor then said, "When I asked you, 'You don't know what you're talking about, Mr. Ross,' it's that one thing you don't know

39

about is when [defendant] was in prison, when he was at ASH, and when he was at Coalinga, correct?" Ross agreed.

As the cross-examination of Ross neared its conclusion, the prosecutor asked whether Ross "personally [had] a fear that [defendant] would reoffend." Ross answered, "I personally don't." The prosecutor then queried whether Ross "would let [defendant] take care of your 13- or 14-year-old son." Ross replied, "Oh, now we're going a little bit further." Ross said that he actually had a 15-year-old son, that he did not "trust anybody," that he rarely let his own son out of his sight, and that he "[did not] understand how these kids get in the hands of other people." The witness asked rhetorically, "Why would a 13-year-old boy be with [defendant]? So that's . . . something I wouldn't allow to happen. My son's allowed to hang around with children his age, not grown adults, male or female."

The prosecutor then interjected, "So parents who have teenage children who end up being victimized by child molesters, they really have themselves to blame by leaving their children out of their care at some period of time?" The court overruled defense counsel's objection that the prosecutor's remark was irrelevant, beyond the scope of cross-examination, and more prejudicial than probative.[13] Ross then responded that he believed "parents should supervise their children and keep [a] maximum amount of supervision. I don't think children should hang around with adults unless they're on a football team, a basketball team, some type of activity." When the prosecutor suggested Ross believed a teenage boy should not be allowed to "hang out with his football coach," the

[13]    Defense counsel asserted this latter ground simply by saying "352," presumably a reference to Evidence Code section 352, which gives a trial court discretion to exclude evidence whose probative value is substantially outweighed by the probability it will cause undue prejudice, confuse the issues, or mislead the jury.

witness agreed, asserting that "[w]hen that football practice ends, I'm right there to pick him up."

The Court of Appeal found the prosecutor acted improperly by accusing Ross of "not know[ing] what [he was] talking about," and by supposedly twisting Ross's testimony to suggest Ross blamed parents, not molesters, if their children were victimized. In the Court of Appeal's view, the prosecutor did not thereby seek to glean relevant information, but instead engaged in forbidden argumentative questioning — a tactic of posing queries that are not actually addressed to the witness, to which answers are not really expected, and that may in fact be unanswerable, as a device to insinuate facts not in evidence, or to make a speech to the jury. (See *People v. Chatman* (2006) 38 Cal.4th 344, 384 (*Chatman*); *People v. Wagner* (1975) 13 Cal.3d 612, 619.) The Court of Appeal asserted that the prosecutor sought merely to "degrade and disparage the witness," and that the defense objections should have been sustained. Defendant echoes those views here.

We are not persuaded. We agree with the People that, in context, the prosecutor's questions were not improper. The prosecutor was entitled to explore reasons why information or opinions supplied by a defense witness might be less than credible and reliable — for example, because of the witness's personal biases, evasiveness, or lack of familiarity with the relevant facts.

Thus, the prosecutor's examination of Ross had established that the witness's experience with defendant was already several years removed, and that Ross did not have accurate recall of precisely when and for how long he had been in contact with defendant before that. The jury was entitled to consider this lack of memory when assessing the value of Ross's claims that defendant was a good patient. As the prosecutor ultimately made clear, his "don't know what you're talking about" question referred specifically to Ross's admitted inability to

41

remember the exact periods he was involved in defendant's treatment. The form of the question may have been somewhat rhetorical, but it was designed simply to confirm this legitimate point. It did not constitute improper argumentation.

Similarly, the prosecutor's suggestion Ross sought to blame parents for sex crimes against their children was not unreasonable in context. After eliciting Ross's assurance that he "personally [didn't]" fear defendant would reoffend, the prosecutor sought, without objection, to probe the depth of this conviction. That there were limits to Ross's trust became clear when the prosecutor next asked whether the witness personally would leave an underage son in defendant's care. In an apparent effort to answer "no" without harming defendant's case, Ross suggested it was his personal practice, and a general parental responsibility, to prevent a child from being in unsupervised contact with any adult. Under these circumstances, the prosecutor did not exceed permissible bounds when he used sarcasm to suggest the witness was trying to have it both ways — to express confidence in defendant while conceding he would not put that confidence to the test — by placing the responsibility for preventing child molestation on parents, rather than the molesters themselves. No impropriety occurred.

**4. Argument regarding potential community response to "not true" verdict.**

The Court of Appeal concluded that the trial court should have sustained defense objections to the prosecutor's "flagrant" misconduct in suggesting the jurors would face disapproval and contempt from their family, friends, and community unless they found defendant to be an SVP. We agree that the prosecutor's argument was improper.

In his rebuttal argument, and over two defense objections, the prosecutor told the jurors they would soon be released from their oath of silence, and could choose to talk to family and friends about the case. If they did so choose, the

prosecutor suggested, they would "have to explain . . . what [they had] been doing for the last two and a half or three weeks." The prosecutor then posited how such a conversation might proceed if the SVP allegations were found not true. He suggested a juror might have difficulty explaining such a verdict in response to questions about the case from these other persons. After learning the matter concerned an SVP commitment petition, the prosecutor proposed, they might ask whether there was evidence defendant had never offended in the past, and the juror would be forced to disclose the evidence of defendant's repeated sex offenses. They might then suggest the jury must have heard from a "top notch, really credible, and believable" defense psychologist, and the juror would have to concede only the "incredible" Dr. Donaldson testified in defendant's behalf. Finally, they might assume the jury relied on the fact defendant had not molested anyone in a long time, as evidence he was a changed man, whereupon the juror would have to acknowledge "there [hadn't] been any teen-agers around" during this period.[14]

---

[14] The prosecutor argued: "So soon, the oath, the promise you made to the judge . . . you will be lifted from that obligation. You can talk to your family. You can talk to your friends. You can talk to [whom] you choose. You may choose not to talk, but you are going to have to explain if you choose what you have been doing for the last two and a half or three weeks. You might start out by saying this was quite a journey. I sometimes feel I went to the moon and came back, and your friends might say, was it a criminal case? No, it was a civil case. It dealt with commitment of someone to a state hospital. Oh, really. Wow. What kind of case was it? Well, it involved a case of someone who was accused of being a sexually violent predator. So, take this out, imagine if you found the petition to be not true in this case. And you explain this to people that you work with, or friends, or neighbors. What did you do? Well, we found the petition to be not true. Oh, wow. That is interesting. Did the person - - " At this point, defense counsel objected that the prosecutor's argument was injecting an improper consideration and taking the jurors outside their proper role. The court responded, "My sense [is] that it wasn't that. So I am going to allow it. Just my sense."

*(Footnote continued on next page.)*

As noted, the Court of Appeal characterized this argument as intended to persuade the jurors that their family and friends would condemn them if they failed to find defendant was an SVP. This, said the Court of Appeal, violated the precept that the jury must not be influenced by " 'mere sentiment, conjecture, sympathy, passion, prejudice, *public opinion or public feeling'* " and must " 'reach a just verdict *regardless of the consequences*.' " (Quoting CALCRIM No. 3454, italics added by the Court of Appeal.)[15]

---

*(Footnote continued from previous page.)*

The prosecutor continued: "The burden is on the People. It is beyond a reasonable doubt, and to feel comfortable with it is how you explain it to yourself, perhaps how you choose to explain it to others. What they say, did you find the petition to be not true, you would do that, did the person, the person had never acted out sexually in the past. Oh, no, no, no. No, far from it. In fact, the person has repeated, repeatedly acted out, had multiple convictions, went to prison. [¶] Well, I guess you found the petition not to be true because you heard from a psychologist that was really top notch, really credible and believable. Well, actually we heard from this guy named Donaldson. He just, well, he was truly not independent. He was just - - there is [a] word for Dr. Donaldson, the word is incredible. So I am not sure how that would play out. [¶] And then perhaps people would say, well, the person . . . hadn't molested anyone for a long time, right, I mean, they knew they were a changed person, assuming that people can change the way they are wired, their sexual preferences, the evidence is that they cannot. So, you might be asked [whether the defendant had not] molested anyone for a long time. That's right. It's been 16 years. Oh, that is really good. But there haven't been any teen-agers around for the 16 years."

At this point, defense counsel again objected, urging the prosecutor was inviting the jurors to consider what other people might think of them. The court responded, "On the surface that's what it sounds like. Again my sense [is] that it's more than that. As it progressed I am more confident now than I was earlier." The court overruled the objection, and the prosecutor moved on to another subject.

[15] Of course, the jury was instructed in precisely this language.

44

We agree.[16]  It is true that " '[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' "  (*People v. Dykes* (2009) 46 Cal.4th 731, 771-772 (*Dykes*), quoting *People v. Frye* (1998) 18 Cal.4th 894, 970; see *People v. Tully* (2012) 54 Cal.4th 952, 1048; *People v. Howard* (1992) 1 Cal.4th 1132, 1192.)

Here, the prosecutor's rhetorical use of a hypothetical conversation with nonjurors might be seen simply as an effort to convince the jurors they would have intellectual difficulty justifying or explaining a "not true" verdict, because such a determination would be illogical and against the credible evidence.  It could be argued that the "conversation" metaphor simply served as a device to work through this reasoning, step by step, by knocking away, one by one, potential bases for finding that defendant was not an SVP.

That may have been one purpose of the prosecutor's argument.  But he could easily and effectively have made similar points without such extensive and focused allusions to a circumstance the jurors were expressly instructed to disregard — the potential community reaction to their verdict.  Because the specter of outside social pressure and community obloquy as improper influences on the jurors' fairness and objectivity is so significant, we cannot countenance

---

**16**     Indeed, the People do not contend otherwise.  In her briefs, and again at oral argument, counsel for the People specifically declined to defend the prosecutor's remarks, urging only that they were harmless.

argumentative insinuations that jurors may confront such difficulties if they make the wrong decision.

The prosecutor must have understood that jurors might interpret his remarks as a warning about the social consequences they would face if they failed to ensure the secure confinement of a dangerous sex offender. Indeed, the prosecutor pressed home this implication by telling the jurors that, unless they avoided all conversation about the case, they would "have to explain" to their family and friends how they had carried out their civic responsibility "for the last two and a half or three weeks," then arguing at length that they would not be able to give a satisfactory explanation. The import was clear, and it cannot be condoned. The prosecutor's argument was improper.

### 5. "Grooming" reference in argument.

As an additional incident of misconduct, the Court of Appeal cited the prosecutor's statement in argument that the jury "[had] been groomed" by defendant. We are not persuaded.

At the outset, the People correctly observe that the defense did not object to this comment and request an admonition to the jury. Because an objection and admonition would have cured any harm, the claim of misconduct was forfeited on appeal. (E.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*).)

In any event, the Court of Appeal's assessment was mistaken. As indicated above, the prosecution experts had discussed at some length defendant's pattern of "grooming" his underage victims, i.e., patiently cultivating and manipulating them to achieve his purposes. At one point in his closing argument, after stressing the manipulative nature of defendant's crimes, the prosecutor told the jury, "You have been groomed. Now, you have been groomed through the testimony of [defendant] trying to say everything that he should say, trying to play on emotions, trying to show that everything is different now. The grooming behavior, the

46

manipulation, it still continues." The Court of Appeal characterized these brief "grooming" references as improper attempts to "plac[e] the jurors in the same position as defendant's victims," to invite them "to view [defendant's crimes] through the [victims'] eyes," and to "appeal[ ] to the passions of the jury by implying they were also defendant's victims."

Not so. Of course a prosecutor generally may not appeal to sympathy for the victims by exhorting the jurors to step into the victims' shoes and imagine their thoughts and feelings as crimes were committed against them. (E.g., *People v. Kipp* (2002) 26 Cal.4th 1100, 1130; *People v. Millwee* (1998) 18 Cal.4th 96, 137; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057.) But that is not a plausible interpretation of the prosecutor's remarks here.

In his testimony, defendant had sought to persuade the jury that he had gained insight, felt remorse for his crimes, and would not reoffend. The prosecutor was entitled to attack the sincerity of these assertions, and to use " '[h]arsh and colorful' " allusions in doing so. (*People v. Pearson* (2013) 56 Cal.4th 393, 442.) Accordingly, the prosecutor was permitted to urge that by saying the right things, appealing to the jurors' emotions, and insisting he was a changed person, defendant was manipulating the jury. In making this argument, the prosecutor was not forbidden to use colorful language that *analogized* defendant's performance on the stand to the "grooming" methods he had employed to commit his crimes. There is no reasonable likelihood the jury construed this reference as an invitation to unfairly empathize with defendant's victims. No misconduct occurred.

### 6. Denigration of defense character witnesses.

With no analysis or citation of authority, the Court of Appeal determined the prosecutor committed misconduct in his argumentative references to defense witnesses Litmon, Johnson, and Grant, who were patients with defendant at ASH

47

and CSH, and who testified to his exemplary behavior and leadership. In his closing argument, the prosecutor asserted that, although the defense did not have to prove anything, "you may consider what they tried to show. So what did they do? They brought in two serial rapists and a child molester to say that [defendant] had good character. . . . It was surreal, but telling."

Defense counsel did not object to this remark, and the claim of misconduct was thus forfeited on appeal. In any event, the Court of Appeal's determination was erroneous on the merits. Harsh and colorful attacks on the credibility of opposing witnesses are permissible if fairly based on the evidence. (E.g., *People v. Parson* (2008) 44 Cal.4th 332, 360; *People v. Arias* (1996) 13 Cal.4th 92, 162; *People v. Sandoval* (1992) 4 Cal.4th 155, 180.) Here the evidence disclosed that Litmon had separate rape convictions in 1973 and 1982, that Johnson had a 1971 conviction for attempted rape and two separate 1980 convictions for rape with great bodily injury, and that Grant had been convicted of at least 45 counts of lewd acts involving six children under 14. The jury was entitled to infer that these felony convictions for crimes of moral turpitude (see *People v. Jones* (2012) 54 Cal.4th 1, 53 [rape]; *In re Lesansky* (2001) 25 Cal.4th 11, 17 [lewd act]) affected the veracity and persuasive value of the witnesses' testimony on defendant's behalf. There was no misconduct.[17]

---

[17]    We note that new rule 9.4 of the California Rules of Court, effective May 23, 2014, adds the following language to the oath prescribed by the Business and Professions Code for the admission of new attorneys to practice: "As an officer of the court, I will strive to conduct myself at all times with dignity, courtesy, and integrity." This "civility oath" serves as an important reminder to lawyers of their general ethical responsibilities in the pursuit of all their professional affairs, including litigation.

**7. Insinuation defendant had committed undisclosed other crimes.**

The Court of Appeal concluded the trial court should have sustained a defense objection to comments by the prosecutor implying defendant had likely committed sex crimes in addition to those disclosed by the evidence. Even if these remarks were improper, we find, for reasons we explain below, that they constitute no basis to disturb the trial judgment.

As indicated above, in discussing the predictive reliability of the Static risk assessment scales, both prosecution experts had suggested these scales actually underestimate the likelihood of reoffense because they only measure charges and convictions, and do not take into account the many sex offenses that are unreported or unprosecuted. In this regard, Dr. Murphy suggested that "we" generally "do a lot of things that we're not caught for."

On cross-examination, the defense expert, Dr. Donaldson, acknowledged that sex crimes are underreported, but he insisted it would be wrong to ascribe an average number of unreported offenses to each offender, because a large majority of unreported sex offenses are committed by a minority of offenders, and most sex offenders do not have undetected crimes. On the other hand, Dr. Donaldson agreed it made sense that "the type of offender who would have unreported victims would be someone who would be a master manipulator" and [s]omeone who was able to persuade victims not to report out of misplaced loyalty . . . or fear . . . ." Dr. Donaldson further conceded there was such evidence in this case.

In his own testimony, defendant denied he had committed offenses in addition to those in evidence at the trial. Defendant agreed when the prosecutor suggested he was "unlucky" for being caught every time he offended.

In his closing argument, the prosecutor commented: "And throughout this trial you have heard that [defendant] may just be the unluckiest child molester in the world, because every single boy he molested he got caught for. Isn't that

49

amazing?  Isn't that amazing?  Of course I am being sarcastic.  That is how I am.  That is a prolific child molester.  All the experts testified that sex crimes go unreported.  People don't tell.  They are ashamed.  They are afraid."  Defense counsel objected, citing lack of evidence.  The objection was overruled.

As the Court of Appeal observed, there was no direct evidence to contradict defendant's insistence he had committed no crimes other than those actually described to the jury.  As a basis for his contrary suggestion, the prosecutor was obviously alluding to the expert witnesses' abstract observations that many sex crimes go unreported, that people generally do things for which they are not caught, and, as Dr. Donaldson conceded, that defendant might be a type of offender who was more likely than average to have unreported crimes.  But none of this had much, if any, tendency in reason to prove defendant himself had, in fact, committed additional offenses.

Thus, it is doubtful the prosecutor had a proper basis to imply, either substantively or for purposes of impeachment, that contrary to defendant's claim, he had committed an unknown number of further crimes.  (See, e.g., *People v. Fuiava* (2012) 53 Cal.4th 622, 728-729 [in capital murder trial, prosecutor committed misconduct by calling defendant a " 'killing machine' " and asking rhetorically " '[h]ow many others' " there were, absent evidence defendant had actually killed anyone else].)  Indeed, the People do not urge the prosecutor acted properly; they concede his argument "may have had the effect of suggesting that defendant had committed other crimes that were not in evidence."  Notwithstanding our doubts about the propriety of this conduct, however, we are persuaded that the prosecutor's argument had no prejudicial effect on the trial, as we explain below.

### 8. Impugning defense expert witness.

As an example of argument that was not "clear" misconduct, but veered "close to the line" and contributed to prejudice, the Court of Appeal cited the following remarks by the prosecutor about Dr. Donaldson's testimony: "You heard from a defense expert. He has a streak that would make Cal Ripken jealous. Cal Ripken the baseball player and the Iron Man that played in something like 4,000 straight games. Dr. Donaldson's streak of 289, 289 straight times testifying exclusively for the defense. [¶] Now he would like to tell you that is not his fault, because he offered to teach the State of California all his wisdom. His brilliance has yet to be fully appreciated by this society. It is appreciated by defense attorneys who pay him and he comes in, and 289 straight times testified for the defense." The Court of Appeal further pointed to the prosecutor's comments that Dr. Donaldson had made a "laughable assertion" by claiming there could be no mental disorder without internal distress, conflict, regret, or struggle, and that the defense expert was "completely biased and unhelpful."

Any claim of misconduct was forfeited by defense counsel's failure to object. In any event, no misconduct occurred. The prosecutor's remarks, though harsh and colorful, were fair comments on the evidence, and they validly assailed the witness's impartiality and professional credibility. They were within the permissible bounds of argument.

### 9. Impugning defense counsel.

Finally, as an additional example of "questionable" prosecutorial argument, the Court of Appeal cited remarks it implied were a borderline case of improper disparagement of opposing counsel. We are not persuaded.

During his closing argument, defense counsel was discussing, apparently with the use of visual aids, whether defendant was "likely" to reoffend unless confined. Purporting to quote the instructions the jury would receive on this

51

subject, counsel recited, " 'You must not find the petition true unless you find that [defendant] is likely to engage in sexual [*sic*] violent predatory behavior,' likely, and then likely was defined for you. 'Likely to engage in sexually violent predatory criminal behavior if there is a serious and well-founded risk that the person will engage in such conduct if released into the community. A serious and well-founded risk' - - *I don't think I need to go into this too much as far as the risk assessment.*" (Italics added.)

In rebuttal, the prosecutor stated that defense counsel had "left something off one of his charts. *Frankly it was deceptive.*" (Italics added.) Defense counsel objected and moved to strike. The objection was overruled. The prosecutor then explained that defense counsel's version of the "likely to reoffend" instruction had not included a crucial qualification, i.e., that " '[t]he likelihood that the person will engage in such conduct does not have to be greater than 50 percent.' " The prosecutor suggested counsel's omission of this proviso was consistent with counsel's objections to the prosecutor's earlier argument that, under the SVPA, a quite low percentage risk of reoffense could nonetheless constitute a likelihood.

" 'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.' [Citations.] 'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation]." (*People v. Edwards* (2013) 57 Cal.4th 658, 738; see *Linton*, *supra*, 56 Cal.4th 1146, 1206.)

Here, the prosecutor's fleeting claim of "deceptive" argument by defense counsel was not an attack on counsel's personal integrity (see *Chatman*, *supra*, 38 Cal.4th 344, 387) but, as explained by the prosecutor, was a fair response to counsel's tactic of providing only selective excerpts of the "likely to reoffend"

52

standard in his instructional discussion. Indeed, counsel's editing appeared intentional when he stopped short by saying, "I don't think I need to go into this too much as far as the risk assessment." There is no reasonable likelihood the jurors misunderstood the import of the prosecutor's remark. No misconduct occurred.

### D. Reversibility.

We have concluded the prosecutor committed misconduct by insinuating that the jurors might not be able to placate their families and friends if they reached a defense verdict, and that he committed arguable misconduct by implying there were additional, unreported sex crimes in defendant's background. We are persuaded, however, that none of these incidents individually warrants reversal of the jury's verdict. Nor do they cumulatively "rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*).)

As a matter of state law, we conclude the conduct at issue did not cause reversible prejudice. The cited incidents were relatively isolated portions of the prosecutor's lengthy arguments, and both were the subjects of general admonitions by the court. As noted (fn. 15, *ante*), the jurors were expressly instructed not to be influenced by "public opinion or public feeling." They were also told that "[n]othing . . . the attorneys say is evidence." The presumptions that jurors understand and follow their instructions (e.g., *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1216) and do not draw the most damaging inferences from ambiguous arguments (e.g., *Dykes*, *supra*, 46 Cal.4th 731, 771-772) minimize our

concern that the instant jury's verdict was influenced by a misapplication of the prosecutor's remarks.**18**

On the other hand, the evidence that defendant met the criteria for commitment as an SVP was very strong. The jury heard that, prior to his 16-year prison and hospital confinement, defendant had committed a long string of sex crimes, some forcible, against as many as 12 underage victims. The jury knew these offenses had involved multiple felony convictions, two separate prison sentences, and several violations of supervised parole. Two prosecution experts testified that defendant's conduct, which persisted despite punitive sanctions and attempts at supervision, demonstrated a compulsive focus on the sexual exploitation of postpubescent minor males, indicated an incurable mental disorder, and evidenced a difficulty in controlling behavior making it likely he would reoffend if free and unsupervised in the community. These witnesses were unpersuaded that he had gained the insight and mastered the control techniques necessary to lessen this risk.

The defense expert disputed many of these conclusions. However, his credibility was undermined by his admissions that his opinions might reflect a

---

**18** We are not persuaded by defendant's argument that *Hill*, *supra*, 17 Cal.4th 800, requires us to find prejudice in the prosecutor's "other crimes" argument. We did say in *Hill* that " '[s]tatements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.' [Citation]." (*Id.*, at p. 828, quoting 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Trial, § 2901, p. 3550.) But our statement was made in the context of a case where the prosecutor's pattern of misconduct was unusually serious and pervasive; it was the cumulative nature of the prosecutor's many unfair courtroom acts that led us to a unanimous reversal there. The principle stated in *Hill* does not absolve an appellate court from determining, on a case-by-case basis, whether a prosecutorial comment or argument caused unfair prejudice under the particular circumstances. For the reasons set forth herein, we find no such prejudice here.

minority view about the nature and indicia of sexually based mental disorders, and that he testified exclusively for defendants in SVP cases, even those involving the most aggravated facts. Under these circumstances, there is no reasonable probability the jury would have reached a different verdict had the clear or arguable acts of misconduct not occurred.

Nor, we find, was there a "pattern" of misconduct so "egregious" that it infected the trial with fundamental unfairness. The single instance of identified misconduct and the additional possible instance of misconduct in this case do not rise to the level of a federal constitutional violation. No basis for reversal appears.

## CONCLUSION

For the reasons we have indicated, the Court of Appeal's decision, overturning the trial court judgment on grounds that multiple incidents of misconduct prejudiced defendant, and created a fundamentally unfair trial, must be reversed. However, because the Court of Appeal found defendant's misconduct claims dispositive, it did not address additional contentions raised by defendant.[19] It now must do so. Accordingly, the cause is remanded to the Court of Appeal with directions to consider these additional claims.

BAXTER, J.

**WE CONCUR:**

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
BIGELOW, J.*

* Presiding Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

[19] In the Court of Appeal, defendant also urged the trial judgment should be reversed because, among other reasons, (1) the trial court improperly told the jury a true finding on the SVP commitment petition would not result in a life sentence, (2) Dr. Murphy violated an in limine order by telling the jury defendant had previously been committed to CSH (see fn. 5, *ante*), and (3) the indeterminate commitment provisions of the SVPA violate state and federal guarantees of due process and equal protection, and against double jeopardy and ex post facto laws.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Shazier

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 212 Cal.App.4th 520
**Rehearing Granted**

_____

**Opinion No.** S208398
**Date Filed:** August 18, 2014

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Alfonso Fernandez and Edward F. Lee

_____

**Counsel:**

Jill A. Fordyce, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit, Laurence K. Sullivan and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jill A. Fordyce
P.O. Box 2058
Los Gatos, CA  95031
(408) 354-0737

Bridget Billeter
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1340