Filed 4/28/22  P. v. Diaz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ADRIAN DIAZ,<br><br>      Defendant and Appellant. | D078614<br><br><br><br>(Super. Ct. No. SCD283828) |


APPEAL from a judgment of the Superior Court of San Diego County, David M. Rubin, Judge.  Affirmed as modified.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Melissa A. Mandel, Assistant Attorney General, Joseph C. Anagnos, Deputy Attorney General for Plaintiff and Respondent.

An information charged defendant Adrian Diaz with robbery (Pen. Code, § 211—count 1)[1] and assault with a deadly weapon (a knife) (§ 245, subd. (a)(1)—count 2). The information alleged Diaz, in committing these offenses, personally used a deadly and dangerous weapon (§ 1192.7, subd. (c)(23)); and personally inflicted great bodily injury on the victim, not an accomplice (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)).

The jury found Diaz not guilty on count 1 and guilty on count 2, and found true the two enhancements. Diaz admitted the truth of the allegation that he previously had been convicted of making a criminal threat (§ 422), which was both a strike prior (§§ 667, subds. (b)-(i), 668, 1170.12) and a serious felony prior (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)(38)). The trial court sentenced Diaz to nine years in prison: the middle term of three years on count 2, doubled to six years due to the strike prior; and an additional three years to run consecutive on the great bodily injury enhancement.

On appeal, Diaz contends: (1) the trial court erred in giving the "mutual combat" self-defense instruction because there was no substantial evidence of mutuality; (2) the prosecutor erred in her remarks during closing argument; (3) the errors were cumulative and prevented him from receiving a fair trial; and (4) the $154 criminal justice administration fee should be vacated as a result of the recent passage of Assembly Bill No. 1869 (former Gov. Code, § 29550 et seq.).

As we explain, we agree as of July 1, 2021, any unpaid balance of the criminal justice administration fee should be vacated and, as the People point out in their brief, certain corrections should be made to the abstract of judgment. In all other respects the judgment is affirmed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Evidence

Victim James M. testified he rode an electric scooter he owned to a Mexican restaurant at about 10:00 p.m. on October 24, 2019. The scooter was similar to those that are seen in the "streets of San Diego" that riders can use through a ride-sharing "App." When he arrived at the restaurant, James saw three men outside "conversing." One of the men was sitting on the ground, whom James identified at trial as Diaz. James observed two bicycles and two backpacks near the men. James assumed the men were "homeless," as he was familiar with the area and knew it was popular with transients. James had never seen any of the men before that night.

James took his scooter inside the restaurant. After ordering food, the cashier directed him to take the scooter outside. James complied, parking the scooter right outside the entrance of the restaurant. James next used the bathroom inside the restaurant. Immediately thereafter, he checked on his scooter and saw one of the three men at the edge of the parking lot running with the scooter "into the darkness." James yelled at the man, "That's my scooter," but the man kept going.

James saw the man who had been sitting on the ground (i.e., Diaz) quickly jump up and get into James's "personal space," coming within about six inches of him. With a "smirk," Diaz told James, " 'It's not your scooter,' " and blocked James's path as James contemplated chasing after the man. James repeated it was his scooter and stated he was going to call the police. "Shaken" and "upset" by the events, James picked up one of the bicycles on the ground and said, " 'I am going to hold onto this until the police get here,' " as he believed all three men were involved in the theft.

3

Diaz yelled a name and the other man, whom James had seen when he first came to the restaurant, came out of the restaurant "irate" and stood about two feet away from James. At the direction of the men, James let go of the bicycle and put his "hands up." James then heard the other man say, " 'Now you're going to get it' " as Diaz and the other man "came at [James]."

James told the jury, "[B]efore I could blink," Diaz "pulled out a knife from his pocket and cut my arm, stabbed my arm." Other than saying he was going to call the police, James testified he had not threatened any of the three men, had not "balled up" his fists as if he wanted to fight, and had no weapon. James described the knife as having about a six-inch blade. James was stabbed in his left bicep, which injury required 17 stiches to close and which left a scar.

After being stabbed by Diaz, James went to the entrance of the restaurant and yelled, " 'Please call 911.' " James then told the two remaining men, " 'You guys aren't leaving. I am calling the police.' " James picked up Diaz's backpack and threw it across the parking lot. The other man in response yelled, " 'Now you're really going to get it.' " James saw both men "square[ ] up" to him as if they were all in a "boxing ring," and the men began punching James.

"[S]cared" and "fighting for [his] life," James fought back, kicking and punching at the two men. The two men at some point stopped fighting and collected their belongings, as James heard sirens. Shortly thereafter, at the request of officers, James identified Diaz as the one who had stabbed him with the knife.

On cross-examination, James denied he started the confrontation with Diaz and the other man. James also denied being "mad" that his scooter was

taken, but instead stated he was just "upset." James stated the only threat he made to the two men was that he was "going to call the police."

Also during cross-examination, the jury was shown a video of an interview with James immediately after the incident, recorded by the body-worn camera of San Diego Police Officer Aaron Merris. A transcript of the video was included in the appellate record. The transcript corroborates much of James's trial testimony. James told the officer that one of three men in front of the restaurant had stolen his scooter and James in response grabbed a bicycle belonging to one of the remaining men to "get an answer" about its whereabouts, which he admitted had been a mistake; that the other two men "thought it was big joke" and "wanted to fight over it"; and that James "was just trying to defend [himself]." James estimated the entire incident lasted about three or four minutes. Officer Merris treated James's stab wound until paramedics arrived.

April D. was the cashier at the restaurant and was the individual who called 911 to report the incident. The audio of her 911 call was played for the jury, and a transcript of the call was included in the appellate record. April informed the 911 operator that there was a fight outside the restaurant and it was "three against one"; that the three were "really hitting" the one and it was "bad" for that man; and that police needed to hurry.

April told the jury she heard the men arguing about a scooter. She did not "see anyone getting physical" before the 911 call because she was behind the register. She saw the man with the scooter (whom she identified as James, after seeing him in court) "back up on the door" of the restaurant and "lift[ ] up his hands" so they were nearly level to his chin in an effort to "protect" himself.

5

April confirmed James had brought his scooter inside the restaurant and she had told him scooters were not allowed. James next asked to use the restroom. While in the restroom, the two men who had been outside came into the restaurant. One man (who April identified as Diaz) asked for a cup of water, and the other man ordered food. Diaz then went back outside.

On cross-examination, April testified when James went outside and found his scooter missing, he came back inside and "nicely" and "in a good way" asked the man who had been with Diaz about its whereabouts. The man responded he did not know. James exited the restaurant, and April then heard him ask Diaz, " 'Where is my scooter?' " April next heard Diaz yell for the man waiting for food to come outside. The man in response "ran" out of the restaurant.

Officer Yianni Hallios of the San Diego Police Department testified he and his partner Officer Merris responded to the October 24 incident. On arrival, Officer Hallios contacted James, who indicated he had been stabbed and pointed to two individuals fleeing the scene. Officer Hallios pursued them on foot and made contact with one of them, Diaz, whom the officer identified in court.

Officer Hallios also interviewed April on the night of the incident and prepared a report that included a summary of her statement. April told Officer Hallios that prior to James's arrival, she saw three transient males outside "while closing the entry door." April gave a description of two of those males, one of whom was Diaz. Shortly thereafter, James arrived on his scooter. She then heard a "verbal altercation" outside the restaurant and called 911 in response. Officer Hallios's report noted April saw James "with both of his hands up" during the altercation as he "back[ed] away" from the other men.

Officer Merris testified he responded with his partner Officer Hallios to the incident. Once the area was secured, Officer Merris walked along the dirt path Diaz had taken as he fled, looking for evidence including a possible weapon. Near a chain-link fence just off the path, Officer Merris found an "open folding knife" resting on ice plant. The knife matched the description James had given officers.

Officer Merris also took a statement from James at the scene of the incident. James told the officer that he rode his scooter to the restaurant and saw a "few homeless guys" near the front door. At the request of the cashier, James left his scooter outside. When he went back outside he saw one of the three men leaving with the scooter. As James went after the guy with the scooter the other two men, one of whom was Diaz, "block[ed] his way" and then "squared up . . . and kept pushing him back into the corner of the restaurant by the front door." James believed the two men wanted to fight and he responded by grabbing a bicycle belonging to one of them. James told the officer that Diaz then "pulled out a knife that was about 7 to 8 inches long," which appeared to have "no handle" and be "one color," and "slashed" his "upper left arm." James kept telling the two men to leave him alone as the police were on the way, but "neither of them would go away."

### Defense Evidence

Diaz testified in his own defense. He stated he went to the Mexican restaurant with an "acquaintance" named "Vince" at around 10:00 p.m. on the night of the incident. Diaz sat on the ground near their bicycles and backpacks. At some point a man Vince knew rode up on his skateboard asking Vince for money and a cigarette. Diaz did not know the man, and was suspicious he might try and take some of their belongings.

A short while later, Diaz saw the same man leaving the restaurant on a scooter while also carrying his skateboard. Diaz started laughing when the man almost fell "face forward" because he was trying to balance his skateboard on the handlebars of the scooter. Up until then Diaz had not seen the scooter. As the skateboarder was riding away, Diaz saw a man come out of the restaurant, whom he identified at trial as James. They made eye contact, and Diaz realized the scooter belonged to James. Diaz told James, " 'You still have a chance to go get your scooter' " and " 'That's the world['s] dumbest criminal[ ], man. That was the stupidest getaway, man. Go get your scooter." James, however, seemed "stuck" on Diaz.

James responded, " 'Oh, you think it's funny' " and then became "confrontational" with Diaz. Diaz remained seated as James went back inside the restaurant for about 30 seconds, then came running outside and made a "dash" for Vince's bicycle. James got on the bicycle and attempted to ride off with it. Diaz jumped in front of the bicycle to prevent James from leaving. James leaned over the handlebars and got "physical" with Diaz. Diaz tried to push James off the bicycle, while also yelling for Vince, who remained inside the restaurant. Diaz and James then "started exchanging blows." Once outside, Vince helped Diaz get James off the bicycle, and then they "chase[d] [James] back into the door, into the door frame" of the restaurant.

At that point Diaz and Vince tried to leave, as they had "retreat[ed]" from the altercation. James, however, was still "in a fighting stance," although he was no longer coming at them. As Vince gathered his belongings and got ready to leave on his bicycle, James "zoom[ed]" in on Diaz and they got "into a tug of war" over Diaz's bicycle, which led to a new round of fighting between James and Diaz. As they were exchanging blows for a

8

second time, Diaz told James he had nothing to do with the theft of James's scooter, to leave him alone, and he did not want to fight anymore. James responded, "he was going to kill" and "skin" Diaz.

James next grabbed Diaz's backpack and threw it across the parking lot, and pulled Diaz's jacket over his head and used his fists and knees to pummel Diaz, including on the head. Because he believed he was losing the fight, Diaz pulled out a knife from his back pocket and slashed James one time, cutting him.

Diaz told the jury he thought it was necessary to use the knife to prevent being seriously hurt by James. After being slashed, James backed off as Diaz tried to leave on his bicycle. Diaz noticed the bicycle chain had fallen off. Hearing sirens, Diaz decided to "ditch" the bicycle and run. Diaz told the jury he ran because he did not think the police would believe his story, as he was homeless, and had a criminal record and "a knife in [his] hand."

During cross-examination, Diaz was asked how many blows he and James exchanged the "first time" their confrontation became physical. Diaz responded one or two. He then was asked, "Is it mutual combat, are you fighting him [i.e., James] as well?" Diaz replied, "Oh, yeah," then added, "I am mostly trying to push him off, trying to get him off the bike. But since he started swinging, I started swinging back." Diaz and Vince then "push[ed]" and "chase[d]" James toward the inside of the restaurant, and James then put his hands up. Although James had his hands up, Diaz believed James still "want[ed] to fight" because he was "angry" about his scooter. James and Diaz then fought a second time, after James tried to take Diaz's backpack and bicycle. It was then that Diaz slashed James on the arm.

9

## DISCUSSION

### I. Self-defense Instructions

Diaz contends the trial court erred when it instructed with CALCRIM No. 3471, "Right to Self-Defense:  Mutual Combat or Initial Aggressor," because there was no substantial evidence of a mutual, preexisting agreement to fight between him and James before the occasion for self-defense arose.  Diaz further contends the error is reviewable on appeal, despite defense counsel's failure to object to the instruction, because it affected his substantial rights.

The People agree there was no forfeiture, but argue there was substantial evidence of an implied agreement to fight before the claimed self-defense occasion arose.  The People in the alternative argue any error in giving CALCRIM No. 3471 was harmless.

### A. *Additional Background*

The record shows after Diaz's testimony and outside the jury's presence, the court discussed what it referred to as the "package" of self-defense instructions.  The court stated it was inclined to give CALCRIM Nos. 3470, 3471, 3472, and 3474.  Neither defense counsel nor the prosecutor objected to any of these instructions.  The court then asked trial counsel if any additional instructions were required on self-defense.  Both answered "No."

The court instructed the jury with CALCRIM No. 3471 in part as follows:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:  [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop

10

fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] . . . [¶]

". . . A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

In addition, the court instructed with CALCRIM Nos. 3470, "Right to Self-Defense or Defense of Another";[2] 3472, "Right to Self-Defense: May Not

---

[2] The court gave CALCRIM No. 3470 as follows: "Self-defense is a defense to assault with a deadly weapon, as charged in Count 2, and the lesser included offense of assault. The defendant is not guilty of assault with a deadly weapon or assault if he used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of bodily injury to him or an imminent danger that he would be touched unlawfully. Defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

11

Be Contrived";[3] and 3474, "Danger No Longer Exists or Attacker Disabled."[4]

## B. *Guiding Principles*

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) Thus, "instructions *not* supported by substantial evidence should not be given." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050 (*Ross*).) Evidence is "[s]ubstantial" for this purpose if it is "sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 (*Barton*).) An instruction not supported by the evidence is subject to the harmless error analysis in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Chism* (2014) 58 Cal.4th 1266, 1299 (*Chism*).)

" '[A]s used in this state's law of self-defense, "mutual combat" means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities. . . .* In

---

"The slightest touching can be unlawful if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty of assault with a deadly weapon, as charged in Count 2 and its lesser offense of assault."

[3] The court instructed with CALCRIM No. 3472 as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

[4] The court also gave CALCRIM No. 3474: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

12

other words, it is not merely the combat, but the *preexisting intention to engage in it*, that must be mutual.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 (*Nguyen*), quoting *Ross, supra*, 155 Cal.App.4th at p. 1045.)

Diaz primarily relies on *Ross*. In that case, the defendant and a woman "engaged in a hostile verbal exchange, at the culmination of which she slapped [the defendant, who] responded with a blow that fractured her cheekbone." (*Ross, supra*, 155 Cal.App.4th at p. 1036.) The defendant was convicted of aggravated assault and battery after the trial court, over defense counsel's objection, instructed the jury that a person charged with assault cannot successfully plead self-defense if he or she was engaged in "mutual combat" with the alleged victim. (*Id.* at p. 1042, fn. 8.) The trial court refused the deliberating jurors' request for a legal definition of "mutual combat," telling them there was no legal definition and instead to rely on the common, everyday meaning of these words.[5] (*Id.* at p. 1043.)

The *Ross* court held this was error. It found the phrase "mutual combat" was "too broad to convey the correct legal principle" (*Ross, supra*, 155 Cal.App.4th at p. 1044); and the jury therefore was "left . . . free to suppose that any exchange of blows disqualifies both participants from claiming a right of self-defense. In fact the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight" (*id.* at p. 1036).

The *Ross* court explained: "The 'combat' element of [the mutual combat] rule is clear enough . . . . It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one

_____

[5] When *Ross* was decided, *former* CALCRIM No. 3471 did not include a definition of "mutual combat," unlike the current version given by the trial court in this case.

another with switchblades, or facing off with six-guns on the dusty streets of fabled Dodge City.  The trouble arises from 'mutual.' " (*Ross, supra*, 155 Cal.App.4th at p. 1043.)  The *Ross* court concluded the phrase " 'mutual combat' is not only ambiguous but a misnomer.  The mutuality triggering the doctrine inheres not in the combat but in the *preexisting intent to engage in it*." (*Id*. at p. 1045.)  It thus found that, for a mutual combat instruction, "there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id*. at p. 1047.)

The *Ross* court went on to find there was insufficient evidence to support the mutual combat instruction.  (*Ross, supra*, 155 Cal.App.4th at p. 1050.)  Instead, it concluded the evidence showed "an exchange of belligerent comments culminating in an impulsive and unexpected blow by [the woman] to which defendant responded with a combination, flurry, or barrage of blows" (*id*. at p. 1052); and therefore, no reasonable juror could conclude beyond a reasonable doubt that when the blows were exchanged, both parties had formed the intent to engage in a fight (*ibid*.).

## C. *Analysis*

### 1. Substantial Evidence Supports the Instruction

As noted, Diaz contends a mutual combat instruction was not supported by the facts of this case because there was no evidence of a prior mutual agreement to fight that occurred "before the claimed occasion for self-defense arose." (See *Ross, supra*, 155 Cal.App.4th at p. 1047.)  Diaz instead contends James initiated the fight, as summarized *ante*.  Of significance here, the agreement need not exist prior to the fight, but only before the claimed occasion for self-defense arose.  (*Ibid*.; see CALCRIM No. 3471.)

14

As summarized *ante*, Diaz claimed there were two confrontations between him and James. According to Diaz, the initial confrontation that led to an exchange of blows arose when James tried to ride off on Vince's bicycle and Diaz stopped him by stepping in front of James, blocking his exit. Sometime thereafter, Vince joined Diaz outside and the two men managed to "push" or "chase" James into the doorway of the restaurant. If the evidence had been limited to this single confrontation, we would agree with Diaz that the facts were insufficient to support giving CALCRIM No. 3471, based on the lack of evidence of mutuality.

However, as noted *ante*, once James was backed into the restaurant's doorway by Diaz and Vince, James put his hands up, as April also confirmed. Diaz and Vince then "retreat[ed]," and there was a clear break in the altercation. At this point, the occasion for Diaz to use self-defense had not yet arisen. According to Diaz, he and James then engaged in a second confrontation, exchanging blows as James next tried to take Diaz's bicycle and/or backpack. James testified he tried to grab the men's belongings because he believed they were also involved in the theft of his scooter and he did not want them to leave the area as the police were enroute. It was during this second altercation that Diaz pulled out the knife and slashed James, believing he needed to defend himself because he was "losing" the fight and, despite his plea to stop and leave him alone, James kept coming at him.

From the foregoing, we conclude a reasonable jury could find the evidence of the second confrontation sufficiently "persuasive" (*Barton*, *supra*, 12 Cal.4th at p. 201, fn. 8) of the existence of an implied "agreement" between Diaz and James to fight: James, "upset" about being "chased" into the doorway after his scooter had been stolen and his belief Diaz was involved; and Diaz, concerned James was going to take his bicycle and/or backpack,

15

after James had already come at him.  (See *ibid.*; CALCRIM No. 3471.)  We thus find the instant case distinguishable from *Ross*, and conclude the trial court did not error in giving this instruction.[6]

## 2.  Harmless Error

An error in giving an instruction that, while correctly stating the law, is inapplicable to the facts of a case is one of state law subject to the traditional *Watson* test, as we have noted.  (See *Chism*, *supra*, 58 Cal.4th at p. 1299; *Guiton*, *supra*, 4 Cal.4th at p. 1129.)  In determining whether the error was prejudicial, we examine the entire record, "including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict.  [Citation.]  Furthermore, instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict."  (*Guiton*, at p. 1130.)  The "appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory."  (*Ibid.*)

---

[6]     We note the evidence appears to have supported a finding of self-defense based on mutual combat *if* the jury had believed Diaz's version of events, as Diaz testified he tried to stop fighting; he indicated by "word or conduct" to James that he had stopped fighting when he told James he did not want to fight any more and to "leave him alone" as he had nothing to do with the theft of the scooter; and he gave James at least one chance, if not two chances, to stop fighting before he pulled out the knife and slashed James after being pummeled in the head.

16

Here, we conclude any purported error in giving CALCRIM No. 3471 was harmless under *Watson*. (See *Chism*, *supra*, 58 Cal.4th at p. 1299; *Guiton*, *supra*, 4 Cal.4th at p. 1129.)

First, other than the instruction itself, the only mention of "mutual combat" was during Diaz's cross-examination (summarized *ante*), when Diaz confirmed he and James were fighting and engaged in "mutual combat"—as that term is commonly understood and not as defined by CALCRIM No. 3471—when they were initially exchanging blows. However, the prosecutor during closing argument did not rely on CALCRIM No. 3471 in arguing Diaz was not entitled to self-defense.

Conversely, the record shows during the closing both the prosecutor and defense counsel focused exclusively on *who* started the fight and thus, whether the other responded in self-defense as instructed by CALCRIM No. 3470.[7] Trial counsel during closing also focused on whether Diaz "used no more force that was reasonably necessary to defend against the danger" when he slashed James with the knife during the second altercation. (See CALCRIM No. 3470.)

As summarized *ante*, the jury was presented with starkly different views of the evidence, based on the testimony of James and Diaz, and was asked to resolve these purely factual questions in determining whether James or Diaz acted in lawful self-defense. (See *Guiton*, *supra*, 4 Cal.4th at

---

[7] The trial court's instruction with CALCRIM No. 3470 is yet another reason the instant case is distinguishable from *Ross*, where the jury was presented with an "all or nothing" choice of self-defense based solely on former CALCRIM No. 3471, despite evidence the defendant may have acted in lawful self-defense. (*Ross*, *supra*, 155 Cal.App.4th at p. 1054 [finding prejudicial error in giving this instruction because it " 'effectively removed [the defendant's] defense of [self-defense] from the jury's consideration' "].)

17

p. 1131 [jurors are "well equipped . . . to analyze evidence and to reach a rational conclusion" using their " 'own intelligence and expertise' "].)

Second, the court instructed with CALCRIM 200 that "[s]ome words or phrases used during this trial have legal meanings that are different from their meanings in everyday use"; that "[t]hese words and phrases will be specifically defined in these instructions"; and to "[p]lease be sure to listen carefully *and follow the definitions that I give you.*"  (Italics added.)  "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 (*Sanchez*); see *People v. Scott* (1988) 200 Cal.App.3d 1090, 1095 [same].)

Third, the jury was instructed that not all instructions may apply in a case:  "Some of these instructions may not apply, depending on your findings about the facts of the case.  Do not assume just because I give an instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."  (See CALCRIM No. 200.)  Thus, if Diaz is correct and there allegedly was insufficient evidence of "mutual combat" to support instructing with CALCRIM No. 3471, the jury would have ignored it, as it was instructed to do.  (See *Sanchez, supra,* 26 Cal.4th at p. 852; CALCRIM No. 200.)

Indeed, nothing in the instructions prevented the jury from considering evidence of self-defense, which was the central issue in this case.  The instructions given did not eliminate Diaz's claim of self-defense.  Rather, the jury rejected the defense based on the evidence which, as summarized *ante*, was more than sufficient to support a reasonable jury's finding beyond a reasonable doubt that Diaz did not act in lawful self-defense when he slashed James with a knife after James had picked up one of the men's bicycles and

18

said he was calling the police. (See *People v. Brown* (2014) 59 Cal.4th 86, 105-106 [substantial evidence is "evidence that is reasonable, credible and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt"]; *People v. Earp* (1999) 20 Cal.4th 826, 887 [on review, we view the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the crime beyond a reasonable doubt]; *id.* at pp. 887-888 [that evidence might reasonably be reconciled with a contrary finding does not render the evidence insubstantial].) We thus reject this claim of error.

## II. Prosecutorial Error

Diaz contends the prosecutor committed misconduct during closing by (1) misstating the law; (2) expressing a personal belief in his guilt; and (3) implying that his failure to disclose his reliance on self-defense prior to trial constituted grounds for disbelieving his testimony.[8]

### A. *Guiding Principles*

" ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other

---

[8] Diaz did not object to any of the statements during the prosecutor's presentation. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["making a timely and specific objection at trial, *and requesting the jury be admonished* . . . , is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal" (italics added)].) We nonetheless reach the merits of this issue. As such, we deem it unnecessary to decide whether Diaz received ineffective assistance based on counsel's failure to object and request an admonition. (*Ibid.* at p. 1328; see *People v. Urbano* (2005) 128 Cal.App.4th 396, 404 [concluding a defendant's claim of ineffective assistance of counsel is moot because the appellate court exercised its discretion to reach the merits of the defendant's challenges to his sentence].)

words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

"Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18, to the extent federal constitutional rights are implicated, and *People v. Watson* (1956) 46 Cal.2d 818 if only state law issues were involved." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*); *People v. Crew* (2003) 31 Cal.4th 822, 839 ["A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct."].) Here, we conclude the *Watson* standard applies to the prosecutor's remarks in this case.

We review de novo a defendant's claim of prosecutorial misconduct. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860 (*Uribe*).) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) We consider the prosecutor's remarks in context of the entire record. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 665-666 (*San Nicolas*).)

As noted, in the absence of evidence to the contrary, we presume that the jury understands and follows instructions from the trial court (*Sanchez*,

*supra*, 26 Cal.4th at p. 852); and that the jurors treat the court's instructions as statements of law, and the arguments of counsel as words spoken by an advocate in an attempt to persuade (*People v. Thornton* (2007) 41 Cal.4th 391, 441 (*Thornton*)).

## B. *Analysis*

### 1. Misstatements of Law

Diaz contends the prosecutor misstated the law when she argued in closing the "age old idea" that "You don't get to bring a knife to a fist fight," and that "You don't get to whip out a knife and stab someone if you guys are pushing and punching one another." According to Diaz, the "obvious import" of these fleeting statements were that Diaz could not act in lawful self-defense because he used a weapon to defend himself when James only used his fists.

When viewed in context of the entire record (see *San Nicolas*, *supra*, 34 Cal.4th at pp. 665-666), we independently conclude it is not reasonably likely the jury construed these statements to mean Diaz as a matter of law could not act in self-defense because he used a knife in the fight (see *Shazier*, *supra*, 60 Cal.4th at p. 127; *Uribe*, *supra*, 199 Cal.App.4th at p. 860). When the prosecutor made these statements, she was reviewing the elements of self-defense as provided in CALCRIM No. 3470, including the requirement that a defendant use no more force than reasonably necessary to defend against the danger. The prosecutor focused on the word "reasonable" in arguing Diaz used more force than "necessary"—an inherently factual question—when he slashed James during the altercation. (See CALCRIM No. 3470.) At no time, however, did the prosecutor argue that self-defense was legally unavailable to Diaz merely because of the knife.

21

Moreover, we note both at the beginning of trial and immediately before closing argument, the trial court told the jury that it was required to follow the law as instructed by the court, even if jurors "disagree with it"; that any remarks or comments by the attorneys regarding the law that conflicted with the court's instructions were to be ignored; and that the remarks of attorneys were not evidence. (See CALCRIM No. 222 [given by the trial court and providing in part: "Nothing that the attorneys say is evidence. In their opening statement and *closing arguments*, the attorneys discuss the case, but their *remarks are not evidence*." (Italics added.)].)

In addition, at the beginning of her closing argument the prosecutor discussed the jury's role as fact-finder: "So what I'm going to do is to take the evidence that you heard and apply it to the law that the judge just read you. Because your job as jurors is [to] take the evidence as you find it, apply it in that equation to figure out if it has been proven beyond a reasonable doubt." It was then the prosecutor again reminded the jury that it was to follow the law as instructed by the trial court: "This is my summary of the instructions that [the trial judge] gave you. *If I say anything different here that is different from the instructions, follow the written law that you g[o]t*." (See *Thornton*, *supra*, 41 Cal.4th at p. 441; *Sanchez*, *supra*, 26 Cal.4th at p. 852.)

We therefore reject this claim of error as it is not reasonably likely the jury construed the prosecutor's statements that bringing a knife to a fist-fight precluded the jury from considering Diaz's claim he acted in lawful self-defense. (See *Shazier*, *supra*, 60 Cal.4th at p. 127; *San Nicolas*, *supra*, 34 Cal.4th at pp. 665-666.)

Diaz also contends the prosecutor misstated the law when arguing whose version of events the jury should believe: "So you're left with, do I believe [James], do I believe [April], do I believe my own eyes when I see the

cut, the ditched knife, the running away from police?  Or do I believe Mr. Diaz?  And it's your job as jurors, and it's pretty much your only job in this case that you're going to work through, is who do I believe, which version of events is accurate?  Do I have a reasonable doubt about this idea that Mr. Diaz shared with you today?"  Diaz claims these statements left jurors with the impression that they should compare the prosecution's and the defense's case on an "equal basis," and suggested *he* was required to prove his version of events beyond a reasonable doubt.

We independently conclude it is unlikely the jury inferred from these remarks that it was Diaz's burden to prove beyond a reasonable doubt that he acted in lawful self-defense.  We note the prosecutor made these statements while discussing how the jury might judge witness credibility, including under CALCRIM No. 226.[9]

Moreover, the trial court repeatedly instructed the jury throughout the case that the prosecutor bore the burden to prove beyond a reasonable doubt the elements of the crimes, a burden the jury clearly understood when it found Diaz *not* guilty on count 1.  The court also instructed with CALCRIM No. 3470, as we have noted, which explained the People had the burden to prove beyond a reasonable doubt that Diaz did not act in lawful self-defense.

---

[9]     The jury was instructed under CALCRIM No. 226 to consider a myriad of "factors" in determining the "credibility or believability of the witnesses," including:  "What was the witness's behavior while testifying?"; "Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?"; "How well was the witness able to remember and describe what happened?"; "How reasonable is the testimony when you consider all the other evidence in the case?"; "Did other evidence prove or disprove any fact about which the witness testified?"; and "Has the witness been convicted of a felony?"

And defense counsel at the very beginning of his closing argument reminded the jury that "in a criminal courthouse, all of the burden lies at this table right here," referring to where the prosecutor was seated, and that the defense "doesn't have to ask questions, doesn't have to make argument, doesn't have to put on evidence" because it is the People's burden to prove guilt beyond a reasonable doubt. (See *Shazier*, *supra*, 60 Cal.4th at p. 127; *Sanchez*, *supra*, 26 Cal.4th at p. 852.) We thus find these remarks were not improper.

## 2. Belief in Diaz's Guilt

Diaz next contends the prosecutor committed error by expressing a personal belief that Diaz was guilty, arguing as follows: "And as the judge pointed out in [CALCRIM No.] 226, there are some ideas as to how to evaluate witness credibility. How to determine whether Mr. Diaz was lying to you. Because I can stand here for the next ten minutes and say he is completely full of it. None of that is true. He is not telling you the truth. Disregard what he is saying. It's completely made up. [¶] But what you need to do is work through that on your own."

In rebuttal, the prosecutor argued the jurors' role was "to look at the evidence," and "to weigh and evaluate credibility." She added, "And it doesn't matter that I know beyond a reasonable doubt what happened. It's that you do. That is why we give you the tools to come to that conclusion. Because that beyond a reasonable doubt standard applies to every single criminal case . . . throughout this country."

It is axiomatic that a "prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial." (*People v. Mincey* (1992) 2 Cal.4th 408, 447.) The danger

24

that the jury will view the prosecutor's expressed belief in the defendant's guilt as being based on outside sources "is acute when the prosecutor offers his [or her] opinion and does not explicitly state that it is based solely on inferences from the evidence at trial." (*People v. Bain* (1971) 5 Cal.3d 839, 848.)

Nevertheless, not all such comments by a prosecutor are improper. We find guidance in the Supreme Court's decision in *People v. Huggins* (2006) 38 Cal.4th 175 (*Huggins*). In that case, the prosecutor during closing argument "asked the jury to believe him [i.e., the prosecutor] that defendant was a liar." (*Id.* at p. 205.) Specifically, regarding the defendant's version of events, the prosecutor argued, " 'None of this can be true. *Please believe me. He has lied through his teeth in trying to sell this story to you.*' " (*Id.* at p. 206, italics added.)

In rejecting the claim of prosecutorial error, the *Huggins* court recognized the "general rule" that "improper vouching for the strength of the prosecution's case ' "involves an attempt to bolster a witness by reference to facts outside the record." ' " (*Huggins*, *supra*, 38 Cal.4th at p. 206.) Importantly for purposes of the instant case, *Huggins* continued, "It is not, however, misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing

argument, and that is essentially what the prosecutor did here." (*Id.* at p. 207.)[10]

Similar to the statements in *Huggins* (and *Lopez*), the prosecutor's statements in the instant case regarding her belief that Diaz was "lying," he was "not telling . . . the truth," and she knew "what happened" did not imply her belief in Diaz's guilt based on evidence not presented at trial. (See *Huggins*, *supra*, 38 Cal.4th at p. 206; *Lopez, supra*, 42 Cal.4th at p. 971.) Instead, as shown by the record, these statements by the prosecutor were in the context of arguing Diaz's story was not to be believed based on *the evidence*, including from the testimony of James and April, and the fact Diaz "ditched" the knife and fled the scene. (See *Shazier*, *supra*, 60 Cal.4th at p. 127.) We thus conclude these remarks by the prosecutor were not improper.

### 3. Postarrest Silence

Diaz also contends the prosecutor erred in arguing that "self-defense doesn't come to mind with the facts or the circumstances for one reason. It's not a thing here. And, in fact, it doesn't even exist in the facts and evidence until today when the defendant decided that he was going to get on the witness stand and tell you a story." The prosecutor added, "And then today

_____

10    See also *People v. Lopez* (2008) 42 Cal.4th 960, 971 (*Lopez*) [concluding the prosecutor's remark in rebuttal, " 'I think [defense counsel's] client is guilty,' " did not constitute prosecutorial error because "the prosecutor's comment did not imply that she based her belief in defendant's guilt on evidence not presented at trial. To the contrary: Because her statement that she believed defendant was guilty immediately followed her comment that, in her view, defense counsel's cross-examination of the victims demonstrated that they were credible, a reasonable juror would most likely infer that the prosecutor based her belief in defendant's guilt on the credibility of the victims' testimony at trial."].)

the defendant decided that he was going to testify." Diaz contends these statements imply he should not be believed because he did not disclose his self-defense theory until he took the witness stand, in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) and other authorities.[11] We are unpersuaded.

In *Doyle*, the United States Supreme Court held a prosecutor violates due process by using the postarrest silence of a defendant who invoked *Miranda* to impeach an exculpatory explanation subsequently offered by the defendant at trial. (*Doyle, supra,* 426 U.S. at p. 617.) "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." (*Ibid.*) The Court has explained: "[The] use of silence for impeachment is fundamentally unfair . . . because '*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . *Doyle* bars the use against a criminal defendant of silence maintained after receipt of government assurances.' " (*Fletcher, supra,* 455 U.S. at p. 606.)

*Doyle* error has two elements, "both of which must exist. The first element is that the prosecution makes *use* of a defendant's postarrest silence

---

11     Diaz's probation report states Diaz postarrest "declined to provide officers with a statement" and claimed "he wanted an attorney." Although the record is silent regarding whether Diaz received *Miranda* warnings, from these statements we will assume he was advised of his rights and invoked them, both of which are required for *Doyle* error. (See *Fletcher v. Weir* (1982) 455 U.S. 603, 607 (*Fletcher*) [concluding there is no due process violation when cross-examining a defendant on his or her postarrest silence when the defendant was not Mirandized].)

27

for impeachment purposes. Use of a defendant's postarrest silence can occur either by questioning or by reference in closing argument. The second essential element is that the trial court *permits* that use. (*Greer* [*v. Miller* (1987) 483 U.S. 756,] 761-764 [(*Greer*)].) The type of permission specified in *Greer* will usually take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate." (See *People v. Evans* (1994) 25 Cal.App.4th 358, 368, fn. omitted (*Evans*); see also *People v. Clark* (2011) 52 Cal.4th 856, 959 (*Clark*) ["The United States Supreme Court has explained a *Doyle* violation does not occur unless the prosecutor is *permitted* to use a defendant's postarrest silence against him at trial."].) In assessing *Doyle* error, we consider the context of the prosecutor's argument, and if that argument is a "fair response to defendant's claim or a fair comment on the evidence," then it is permissible. (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448 (*Champion*).)

Here, we conclude there was no *Doyle* error because the prosecutor's remarks were made in reference to the evidence and the credibility (or lack thereof) of the witnesses. Indeed, immediately following these remarks the prosecutor argued the totality of the evidence supported a finding that Diaz had not acted in lawful self-defense, including from the testimony of James, April and her 911 call, and James's statements to Officer Merris following the incident, all of which are summarized *ante*.

In addition and as we have noted, *throughout* the trial in this case the primary issue before the jury was who started the altercation and, depending on that finding, whether James or Diaz acted in lawful self-defense. As summarized *ante*, the defense in questioning James sought to portray him as the instigator of the fight, as "mad" and not merely "upset," after James

28

testified he believed Diaz was involved in the theft of his scooter. The prosecutor's remarks that self-defense only became an issue on the day Diaz testified is thus belied by the record in this case, including by the parties' opening statements when defense counsel argued Diaz did not "*unlawfully* assault" James. (Italics added.) (See *Thornton*, *supra*, 41 Cal.4th at p. 441 [jurors are instructed to treat the court's instructions as the law, and the arguments of counsel as words of an advocate].)

Considered in context, it is unlikely the jury inferred from a few fleeting remarks by the prosecutor that Diaz had an obligation to disclose his "story" between the time of his arrest and trial. Certainly, that was not the focus of the prosecutor's argument. Instead, a reasonable jury would have understood the prosecutor's remarks as a "fair comment on the evidence" and not on Diaz's postarrest silence. (See *Champion*, *supra*, 134 Cal.App.4th at p. 1448.)[12]

---

[12] For the same reasons, we find inapposite the case of *People v. Lindsey* (1988) 205 Cal.App.3d 112 on which Diaz also heavily relies. In *Lindsey*, the prosecutor condemned defense counsel for failing to disclose before trial the defendant's alibi defense, after the defendant had invoked his right to remain silent under *Miranda*. Unlike the facts of the instant case in which the prosecutor's remarks were made in the context of arguing the evidence and the credibility of witnesses, the prosecutor's argument in *Lindsey* had nothing to do with the evidence: " 'Well, it makes me angry as an officer of the court that this man [i.e., the defendant] who is innocent, according to [defense counsel's] words, has sat in jail since February 4th, went through a Preliminary Examination when the alibi was there all the time and this man was in jail and this woman allowed him to sit in jail without coming to the District Attorney's Office, without coming to the Police Department saying, listen, we've got proof . . . that this man didn't do the crime. Where was this information until today? It's inconceivable. It goes against common sense, and it is unreasonable to believe that another officer of the court would allow her innocent client to sit in jail for five months and not say anything to anyone.' " (*Id.* at pp. 115-116.)

29

Moreover, we separately conclude there was no *Doyle* error because the second *essential* element is missing:  there is no showing the trial court in this case "permit[ted]" the prosecutor to use Diaz's postarrest silence against him (see *Greer*, *supra*, 483 U.S. at pp. 761-764; *Clark*, *supra*, 52 Cal.4th at p. 959), "thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate" (see *Evans*, *supra*, 25 Cal.App.4th at p. 368).

### III.  Cumulative Error

Diaz contends that, even if the asserted errors individually do not warrant reversal, the cumulative effect of them does.  "A predicate to a claim of cumulative error is a finding of error.  There can be no cumulative error if the challenged rulings were not erroneous."  (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)

Moreover, to the "extent there are instances in which we have found error or assumed its existence, we have concluded no prejudice resulted." (*Chism*, *supra*, 58 Cal.4th at p. 1309; see *People v. Williams* (2015) 61 Cal.4th 1244, 1291 [rejecting the defendant's claim that "numerous alleged errors, committed during both phases of his trial, cumulatively prejudiced him" because there was either no error "or, in those instances where error has been found or assumed, no prejudice"].)

Because, in the instant case, there was no error or any purported error was deemed harmless, we reject Diaz's contention that his trial was fundamentally unfair under the cumulative error doctrine.  (See *People v. Rivera* (2019) 7 Cal.5th 306, 348 [concluding that, even if the trial court erred in admitting evidence of the defendant's "postcrime statements and conduct," "it was not individually prejudicial," and thus, refusing to apply the cumulative error doctrine to reverse the defendant's judgment].)

## IV. Criminal Administration Fee

After Diaz was sentenced and while his appeal was pending, Assembly Bill No. 1869 (2019–2020 Reg. Sess.) was signed into law. As of July 1, 2021, under Assembly Bill No. 1869, the provision pursuant to which the court ordered Diaz to pay a $154 criminal justice administration fee (former Government Code section 29550.1) was repealed, and Government Code section 6111 was added. (Assem. Bill No. 1869, §§ 11, 24.)

Government Code section 6111, subdivision (a), provides in relevant part: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . Sections 29550.1 . . . , as th[at] section[ ] read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

Diaz, relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), contends Assembly Bill No. 1869 applies retroactively and therefore we should strike from the judgment the entire criminal justice administration fee, rather than just the unpaid portion of this fee as the People contend.

This court recently considered the same arguments raised by Diaz and determined *Estrada* did not apply because Government Code section 6111 expressly provided the fee was collectible until June 30, 2021. (See *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 952.) We adhere to our analysis and conclusion in *Lopez-Vinck*: the repeal of Government Code section 29550.1 does not entitle Diaz to a disposition striking the imposition of the $154 criminal justice administration fee, or to a vacatur of the fee in its entirety. Instead, pursuant to section 6111 of the Government Code, Diaz is

entitled to have that portion of the $154 fee that remained unpaid as of July 1, 2021, vacated from the judgment.[13]

## V. Corrections to Abstract of Judgment

The People in their brief have identified the following errors in the abstract of judgment:  In table 2, change "PC 12022.27(a)" to "PC12022.7(a)"; in table 3, delete the serious felony prior enhancement, as the trial court struck, as opposed to stayed it; and in table 4, check the second box marked "per PC 667(b)-(i) or PC 1170.12 (strike prior)."  Diaz's reply brief is silent on the need for these corrections.  We agree with the People.  Accordingly, the trial court should make these corrections to adhere to the judgment as reflected in the reporter's transcript and the trial court's minute orders.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 188.)

## DISPOSITION

The superior court is instructed to vacate any portion of the criminal justice administration fee that remains unpaid after July 1, 2021, pursuant to Assembly Bill No. 1869; and to make the corrections to the abstract of judgment in accordance with this opinion.  The superior court is directed to prepare an amended abstract of judgment with these changes and forward a

---

[13]   Because the trial court stayed imposition of the criminal justice administration fee, Diaz will have paid none of this fee regardless of whether *Estrada* applied in this case.

32

certified copy to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.